[Cite as *State v. Hartman*, 2016-Ohio-2883.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 26609 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 14-CR-834 |
| v. | : | |
| | : | (Criminal Appeal from |
| MARK HARTMAN | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of May, 2016.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402

      Attorney for Plaintiff-Appellee

S. ADELE SHANK, Atty. Reg. No. 0022148, Law Office of S. Adele Shank, 3380 Tremont Road, 2nd Floor, Columbus, Ohio 43221-2112
and
LAWRENCE J. GREGER, Atty. Reg. No. 0002592, Suite 1100 Liberty Tower, 120 West Second Street, Dayton, Ohio 45402

      Attorneys for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant Mark Hartman appeals from his conviction and

sentence on three counts of Rape. Hartman sets forth fifteen assignments of error, alleging numerous issues involving ineffective assistance of counsel, a defective indictment, the improper admission of hearsay, a confrontation clause error based on the admission of scientific evidence from an improper source, and that his convictions are both unsupported by sufficient evidence and against the manifest weight of the evidence. Hartman also argues that the cumulative effect of all errors requires reversal. The State asserts that Hartman was not prejudiced by any of the alleged errors.

{¶ 2} We conclude that sufficient evidence was presented to support the convictions and that the convictions are not against the manifest weight of the evidence. We conclude that the indictment was not defective, that any errors regarding the admission of hearsay were harmless, and that trial counsel's strategic decisions, if falling below an objective standard of reasonable representation, are not sufficiently prejudicial to conclude that there is a reasonable probability that the outcome of the trial would have been different but for the ineffective assistance of counsel. We conclude that the potential error which may have affected the defendant's right to confrontation was waived. Finally, we conclude that even considered cumulatively, any errors are not sufficiently prejudicial to merit reversal. Accordingly, the judgment of the trial court is Affirmed.

## I. Late Night Party Leads to Sexual Encounter

{¶ 3} During his winter break from college, Mark Hartman agreed to spend the evening with his best friend, Gordon, who was housesitting at the home of a family friend. Hartman, Gordon, and one other friend were drinking heavily. Gordon texted a female friend, Courtney, inviting her to the party. Courtney agreed, and brought two of her

girlfriends with her, M.W. and Cassie. The women arrived at the party around 11:00 p.m. Some time during the evening, M.W. texted her parents to let them know she would not be returning home that evening. After about one hour at the party, Cassie texted her friends to silently communicate that she wanted to leave, because she was allergic to the dog in the house. Courtney and M.W left the party and took Cassie back to Courtney's house, where she had left her car. M.W. and Courtney returned to the party after 1:00 a.m. and joined the men in their drinking and card-playing.

{¶ 4} After the third male went to bed, Courtney and Gordon were in the bathroom together, which left M.W. and Hartman alone in the living room. M.W. testified that she wanted to go to bed, and Hartman agreed to show her to a bedroom. M.W. testified that she was a willing participant when Hartman began to kiss her. After this point, M.W.'s and Hartman's versions of the facts began to diverge.

{¶ 5}  M.W. testified that after she and Hartman entered the bedroom, he initiated kissing, and she was okay with that. She testified that as Hartman continued to kiss her, he put his hand up her shirt, she said no, and he stopped. M.W. testified that "then we kept kissing and he pushed me onto the bed, and then he went up my shirt again. And again I said no. Which was fine. So we kept - - we kissed again. And then that's when he started to go down my pants, and I said no. And that's when it didn't stop. He just kept saying things like, it's fine, it will be okay, it will be fun, stuff like that. So then he went ahead and took off my shirt and bra." Trial Transcript at 29.

{¶ 6}  M.W. testified that she began to get nervous because she was not sure what was going to happen. She testified that Hartman continued to go down her pants again as he was kissing her, and she kept saying "no, that I didn't want to do that." *Id.* at 30.  She

described that he removed her shirt, bra, and leggings, and then removed his own clothes. She testified, "that's when I basically just started to get really scared about the situation and wasn't sure how to handle the situation." *Id.* She explained the basis of her fear by testifying:

I was scared because I knew that I was not as strong as he was, and I knew that if he would have done anything like hit me or anything like that I would have been out and I wouldn't have really remembered what had happened. And it was more important to me to remember what was happening to me than not know what was happening to me. As a girl growing up in your teenage years, you hear a ton of stories about what people can do to you and what, you know, strangers do and you don't know the person and you're not sure what they're going to do. So it just really scared me to not - - like and I didn't know who was around me. I didn't know where Courtney was. I didn't know where anyone else in the house was. And I just got really scared that something bad might have happened to me. And then I kept thinking that in this situation I can outsmart the situation, and you know, I can get out the smart way. And I like have been told how to get out of these situations and how to be smart. So that's what I kept thinking, was how I was going to get out because I knew I wasn't strong enough. And I was worried about being hit, or something.

*Id.* at 32.

{¶ 7}  M.W. testified that Hartman continued to kiss her – causing the hickeys on her neck, and he continued to touch her in different places, including penetrating her

vagina with his fingers. When asked what she was doing at this point, M.W. responded:

> I was just sitting there. A few times I had started to go along with it because I thought that if I went along with some of it, he might let me go and he might think that I was like kind of into it, too, and that if he thought that, that he might let me leave or like go and do something to the point where I could try and get out and escape. But basically, the whole time I would say no before and I just kind of sat there. I wasn't really into it or doing anything back. I was just there.

*Id.* at 35.

{¶ 8}  M.W. testified that Hartman proceeded to penetrate her vagina with his penis after she said no, and that he kept saying "like its okay, it will be fine, it will be fun, don't worry about it." *Id.* at 36. M.W. testified that she kept saying no, and was numb because she was so scared.   She testified that he stopped, took a break, and then began touching her again, and again penetrated her vagina with his penis. Afterwards, M.W. testified that she left the room and went into the bathroom, and that Hartman followed her, and began kissing her again. She described that he grabbed her arms, using enough force to pull her into the shower with him. She again testified that she "started to go along with it, too, because I was scared it was going to happen again and I wanted to get out of the situation, and I was like maybe -- again, I kept thinking the same thing. If I go along with this, there might be a chance that I can get out of this situation. So that's what I kept thinking the whole time was if I go along with this for a little bit, there might be a chance that I can get out and this wouldn't have happened to me." *Id.* at 40.

{¶ 9}  M.W. testified that after they showered, they returned to the bedroom, and

Hartman began kissing her again, pushed her back onto the bed and again he penetrated her vagina with his penis. M.W. testified that "I was just so numb and didn't really feel like fighting back because I was so scared. And I was like, you know what, I'll just let it happen and then it will be done and then I'll get out of the situation." *Id.* at 41.     M.W. testified that when he was done, she attempted to leave the bed, but he pulled her back into the bed. When she thought Hartman was asleep, she tried to move, but he was still awake and he asked her to stay. M.W. testified that she agreed to stay there with him "because I didn't want anything to happen again." *Id.* at 42.

**{¶ 10}** Hartman's version of the facts was presented though the admission of a written statement he gave to the police the day after the event, State's Ex. 24, the testimony of the officer who interviewed him, and from Hartman's testimony at trial. Hartman admitted that he was intoxicated earlier in the evening, but he testified that he had stopped drinking alcoholic beverages, and was drinking water before the sexual encounter. He testified that M.W. initiated intimacy by kissing him before they went to the bedroom. He testified that they engaged in a good amount of kissing, and when he began to feel her breasts, and when he slid his hand down her pants, he specifically asked if she would like to have sex, and she answered yes. He testified that she willingly participated in the sexual encounter by helping to remove her own clothes and his clothes, asked him to squeeze her breasts and guided his hand, switched positions, and upon request willingly engaged in oral sex. Hartman testified that the only time she said "No" was when he asked if "we could have sex until we finished, and she said no at that time."   He stated that he stopped after she said "No," and then they conversed a bit, talking about life, relationships and school, and then he asked again "if we could finish," and she said, "Yes, go ahead."

Because he did not have a second condom, he asked if she was on birth control, and she replied, "you really think I would have sex with a random 20 years old without birth control?" His testimony that he pulled out and ejaculated on the bed was later corroborated by DNA testing on the bed coverings. The fact that M.W. was taking birth-control medication was reflected in hospital records.

{¶ 11} The victim's testimony reflects that she did have her cell phone with her that evening -- she received a text from the other female at the party that she wanted to go home, and she texted her parents to tell them she would not be coming home that evening. The text messages that M.W. and her friend Courtney sent to each other later that morning were admitted into evidence as defendant's Ex. H. In the text messages, M.W. expressed reluctance about reporting the sexual assault, in the following exchange:

M.W.:        I need to think about if I want to press charges or not.

Courtney:    What are you thinking?

M.W.:        I don't know. I really don't know.

Courtney:    Are you wanting to confront him?

M.W.:        No. I don't ever want to talk to him. I just don't know if I should press charges and it'll be big because "rape in the [R.] house."

Courtney:    I didn't even think of that. He needs to know what he did was wrong. Was protection used? And did you shower before or after? As far as the [Rs], oh well.

M.W.:        I know. I agree but I can't handle a big thing. I can't even remember things because I was so in shock. I'm not sure if he did it [or] not. And in between.

{¶ 12}  After M.W. told her parents what had happened to her, she was taken to the hospital, arriving at 3:39 P.M.   She was initially examined by an ER doctor, then she talked to the police detective, and then she was referred to a nurse designated as a "sexual assault nurse examiner."[1]   This nurse interviewed M.W., making notes, Ex. 20, which recorded the victim's allegations as follows:

> Courtney and I went back to the house that one of the guys was housesitting for. Me and Mike was taking a tour of the house when he showed me to the bedroom which was downstairs. Mike kissed me on the lips and tried to take my shirt off and I said no, I'm not doing that. He (clarified with patient that he was Mike) kept kissing me over and over again and I kept yelling at him, telling him to stop. That's when things went from bad to worse. Mike pushed me on the bed and I landed on my back. He kept trying to kiss me and this time pulled off my shirt. He held my hands down beside me and kissed all over my neck, face and chest. He (clarified with patient that he is Mike) pulled off my leggings. I kept telling him no, get off of me, but he didn't. He had sex with me and stuck his hands inside of me. I managed to get free and go to the bathroom, and he followed me in there, grabbing my arms trying to pull me in the shower, asking me to take a shower with him. When I wouldn't he got mad and pulled on my arms back into the bedroom. He raped me again. Clarified with patient that Mike stuck

---

[1] The nurse testified that she had attended a 40-hour class in forensics, but she was not certified as a sexual assault nurse examiner.

penis and hands inside of vagina. I kept trying to leave but he wouldn't let me. My friend finally came upstairs and got me out of there.

{¶ 13} The medical records also indicate that during the process at the hospital, the victim's parents were present, and also present were the victim witness advocate, an Oakwood police officer and an Oakwood police detective. The medical records confirm that M.W. was not physically injured during the assault, other than the neck bruising referred to as hickeys. M.W. testified that since the event, she is no longer a social person, that she is scared to do anything, and no longer goes anywhere alone.

{¶ 14} The day after the alleged incident, defense counsel advised Hartman to create a written description of everything about the incident, which was given to police two days after the incident. Defense counsel accompanied his client to two police interviews. Hartman freely answered all questions asked during the interviews.

## II. The Course of Proceedings

{¶ 15} Hartman was indicted on three counts of Rape, felonies of the first degree, in violation of R.C. 2907.02(A)(2). About a month after the indictment, the defendant waived, in writing, his right to a jury trial and elected to have his case heard by the trial judge, after acknowledging that he had a constitutional right to a trial by jury.

{¶ 16} Pertinent to this appeal, we note that Hartman did not move to dismiss the indictment, did not request a bill of particulars, and did not file any motions regarding discovery, until after the trial.

{¶ 17} A two-day trial was had before the trial judge, acting as the trier of fact. Ten days after the trial, the trial court made the following announcement in open court:

Good afternoon everyone. We are, of course, present in the case of State of Ohio v. Hartman, 2014-CR-834. Obviously, we are here for me to announce the verdicts that I have arrived at in this case, following the presentation of the evidence during the two day bench trial on September 29th and September 30th.

I realize given the stakes and emotions at issue, that everyone in the courtroom is on edge, and that includes this judge. This case, given the circumstances, and the role I was required to play has been very difficult. It's been very difficult for me, and I know for all concerned.

I also realized that many of you in this courtroom are going to be devastated by the verdicts after they are announced, and there's nothing I can do about that. This will be of little help to those so devastated. I want you to know that I considered this matter very, very carefully; and I approached it with the diligence and the care that it deserves. This being said, I, of course, had to make decisions and I have arrived at those decisions and I'm now going to announce those decisions.

Going first to Count I of the indictment, I find, based upon the evidence presented, the applicable law and my assessment of witness credibility that the State of Ohio proved beyond a reasonable doubt all the essential elements of rape as charged in Count 1 of the indictment. The State, that is, proved beyond a reasonable doubt that on December 31, 2013 and in Montgomery County, Ohio, the Defendant, Mark Hartman

engaged in sexual conduct, digital penetration with M.W. by purposely compelling her to submit to such sexual conduct by forced [sic] or threat of force.

Going into Count II, I find again, based upon the evidence presented, the applicable law, and my assessment of witness credibility that the State of Ohio proved beyond a reasonable doubt all of the essential elements of rape as charged in Count II of the indictment. The State, that is, proved beyond a reasonable doubt that on December 31, 2013 and in Montgomery County, Ohio, the Defendant, Mark Hartman engaged in sexual conduct, vaginal intercourse with M.W. by purposely compelling her to submit to such sexual conduct by force or threat of force.

And finally, as it relates to Count III of the indictment, I finally find again, based upon the evidence presented, the applicable law, and my assessment of witness credibility that the State of Ohio proved beyond a reasonable doubt all of the essential elements of Count III, of rape as charged in Count III of the indictment. The State, that is, proved beyond a reasonable doubt that on December 31, 2013 and in Montgomery County, Ohio, the Defendant, Mark Hartman engaged in sexual conduct, vaginal intercourse with M.W. by purposely compelling her to submit to such sexual conduct by force or threat of force.

**{¶ 18}** Hartman moved for a new trial, arguing that reasonable doubt existed as a matter of law because the victim's testimony was not consistent with the substantive evidence, that the court should have considered the lesser-included offense of Sexual

Battery, and that the State of Ohio failed to fully disclose all exculpatory evidence. The trial court conducted a hearing on the motion for a new trial, and accepted testimony from Mark Squibb, an employee of the Miami Valley Regional Crime Laboratory, and Detective Norris from the Oakwood Public Safety Department. During trial, Squibb was qualified as an expert in the field of DNA analysis. Squibb explained that the police gather evidence and submit it to the laboratory for testing. Each item or exhibit submitted for testing is given a submission number and a submittal sheet is filled out by the requesting agency identifying the item and the type of testing requested. Once submitted it is retained in a property room that is only accessible by individuals in the DNA section. When it is assigned to an analyst, that person will remove it from the evidence room, keep it in their care and custody, perform the testing, and then the item is returned to the law enforcement agency that supplied the item. The DNA lab retains any samples found to contain DNA.

{¶ 19}  Squibb was not the analyst who performed the screening or testing. Squibb conducted a technical review of the analyst's work, and testified from the contents of analyst's report. He did not inspect the comforter or conduct any part of the extraction or testing.  At the post-trial hearing, Squibb testified that part of his review process was to review the case notes of the lab technician, but these notes had not been requested or provided to defense counsel. Emily Draper, who wrote the notes and performed the testing, did not testify at trial or at the post-trial hearing.  The testing generated two Laboratory Reports, one on the rape kit and one on the comforter. Squibb's testimony revealed that the lab's approach is to first test the most probative evidence to confirm or deny that sexual activity has taken place, and if that test is positive, the testing on the remaining swabs are deferred until some action is initiated by someone to do further

testing. The notes of Emily Draper were interpreted by Squibb to mean that after Hartman's DNA was matched with swabs from M.W.'s vagina, the lab did not test swabs taken from rectal, oral and underwear samples or the comforter. Squibb testified that the police originally requested testing on both the rape kit and the comforter, but once Hartman's DNA was found from the rape kit, they did not test the comforter until a later time after it was requested again. From the notes he reviewed, Squibb did not know who made that second request, or when it was made. Squibb testified that they had electronic records of the original submittal from the law enforcement agency and the subsequent request that caused the comforter to be tested, but he did not have those records and could not testify to their content. In response to questions by the trial court, Squibb also testified that he had personally added highlighting and other markings to the lab report to assist himself in his testimony.

{¶ 20} The trial court overruled the motion for a new trial, making the following findings of fact:

Mark Hartman, in the hours before the sexual conduct, consumed a significant amount of alcohol. M.W. and Mr. Hartman had not met before the December 30-31 "get together" at the [Rs'] Oakwood home. M.W., in fact referred to Mr. Hartman as "Mike" in the immediate aftermath of that which occurred. M.W. had not previously been in the [R] home, and thus, was not familiar with the home's layout which, apparently, is rather unique. M.W. did not know where the remaining occupants of the home were as the critical events unfolded. M.W., in short, was confronted with the following as the sexual conduct occurred- a larger, stronger intoxicated individual she

did not know (and thus, she could not gauge how he might react) with the events occurring in an unfamiliar home at a time when she did not know the location of the home's remaining occupants. The element of force regarding each rape count must be reviewed with those facts in mind.

REVIEW OF THE RAPE COUNTS

Mark Hartman escorted M.W. to a bedroom within the [R.] home so that M.W. could go to bed. Mr. Hartman after escorting M.W. to the bedroom, began kissing M.W. while they were standing near the bedroom door. M.W. consented to the kissing initiated by Mr. Hartman.

Mr. Hartman, as the kissing continued, placed a hand under M.W.'s shirt and moved the hand upward toward M.W.'s breasts. M.W. indicated she did not want this to occur with Mr. Hartman, at this point, removing his hand from underneath M.W.'s shirt.

Mr. Hartman, at this point, pushed M.W. onto the bed. Mr. Hartman placed a hand underneath M.W.'s pants. M.W., once again, indicated she did not want this activity to occur. Mr. Hartman did not withdraw his hand, but instead told M.W. "it will be okay," "it will be fine," and "it will be fun."

Mr. Hartman, after saying these words, beg[a]n to take off M.W.'s shirt and bra. M.W., as this was occurring said, "no" but Mr. Hartman, ignoring M.W.'s protest, completed the removal of the shirt and bra. Mr.Har[t]man, ignoring M.W.'s indication that she did not want the conduct to progress, removed his clothes and M.W.'s pants.

M.W., at this point, became frightened and unsure concerning how

to "handle the situation." M.W.'s fear was prompted by her recognition she did not have sufficient strength to overcome Mr. Hartman, with this fear including the thought that Mr. Hartman, an individual she did not know, could render her unconscious, and if this occurred, she would not remember what occurred. M.W. was also concerned because she did not know the location of the home's remaining occupants.

Mark Hartman, after removing M.W's clothing, continued to kiss M.W. M.W. failed to respond with Mr. Hartman, at this point, kissing each side of M.W.'s neck. The results of the kissing are depicted by State's Exhibits 4-9. Mr. Hartman, additionally, began touching M.W.'s body with his hands and fingers, such touching included "grabbing" M.W.'s breasts and touching M.W.'s vagina with this touching including Mr. Hartman's digital penetration of M.W.'s vagina. Mark Hartman at this point, initiated sexual conduct with M.W. by inserting his penis into her vagina. M.W., before the penetration occurred, said "no" with Mr. Hartman responding that it would be "okay", it would be "fine" and it would be "fun." The vaginal penetration continued for a "minute or two."

Mark Hartman, at this juncture, removed his penis from M.W.'s vagina. M.W. interpreted this as a "break" because soon thereafter Mark Hartman began touching M.W. once again with this renewed touching culminating with Mr. Hartman, for the second time, penetrating his penis into M.W.'s vagina. This episode continued for a minute or two.

M.W., after the second penis/vaginal penetration terminated,

decided, with her thought being such activity might create an escape opportunity, to go into the bathroom connected to the bedroom. Mark Hartman, however, followed M.W. into the bathroom. Mr. Hartman, after entering the bathroom, began kissing M.W. Mr. Hartman then pulled M.W. into the shower and turned on the water. Mr. Hartman once again began touching M.W.'s breasts and vagina. M.W. began crying, but she placed her face into the running water to hide this from Mr. Hartman.

M.W. exited the shower and informed Mr. Hartman that she did not "want this." M.W. walked back into the bedroom with Mr. Hartman following. Mr. Hartman, at this time, started to kiss M.W. once again, and while doing so, pushed M.W. back onto the bed. Mark Hartman, at this point, and for the third time, penetrated his penis into M.W.'s vagina with this episode continuing for sixty to ninety seconds.

Mark Hartman, after this last act, rolled off of M.W. M.W., thereafter, attempted on two occasions to leave the bedroom with each attempt prompting Mark Hartman's request that she stay. M.W., fearful of what Mr. Hartman's reaction may have been if she refused, stayed until Courtney, sometime during the morning hours, entered the bedroom. M.W., upon Courtney's arrival, quickly exited the [R.] home.

Dkt.# 80, pgs. 7-9.

{¶ 21} Addressing the evidence on the element of force, the trial court concluded:

Mark Hartman, as to Count I, continued his sexual advance upon M.W. despite her verbal indication that she did not consent to the activity.

Mr. Hartman pushed M.W. onto the bed, and without her consent, removed her clothing, used his hands and fingers to touch M.W.'s breasts and vagina, and finally, penetrated M.W.'s vagina with his penis. The conduct constitutes force necessary to establish beyond a reasonable doubt the force element. This conclusion recognizes the force element is, by necessity, a relative concept, that M.W.'s resistance is not a prerequisite to the force element, and that the force element must be viewed within the context of M.W.'s concerns regarding Mr. Hartman's size and strength relative to her size and strength, that Mr. Hartman was intoxicated, that she did not know Mr. Hartman, and that as the sexual conduct was occurring, she did not know the location of the remaining occupants of the home.

Mark Hartman's conduct relating to Count 2 must be viewed within the context of that which had already occurred. Mr. Hartman, having already ignored M.W.'s entreaties to stop and while he remained on top of M.W., once again penetrated M.W.'s vagina with his penis. This conduct, recognizing the concepts and concerns discussed above, constitutes the force necessary to establish beyond a reasonable doubt the force element as to Count 2.

Turning, finally, to Count 3, Mr. Hartman's conduct must, once again, be viewed within the context of that which had already occurred. Mr. Hartman, ignoring a final entreaty to stop, once again began kissing and touching M.W., pushed her onto the bed, positioned himself on top of M.W., and penetrated M.W.'s vagina with his penis. This conduct, again

recognizing the concepts and concerns already discussed, constitutes force necessary to establish beyond a reasonable doubt the element of force.

[Fn.] Mr. Hartman's motion vigorously argues that M.W.'s testimony that she at certain points "went along" with the sexual activity makes a finding of force impossible. M.W. testified that on occasion she did "go along with some of it" with the hope that by doing so Mr. Hartman might conclude she was "into it" with the thought being that if Mr. Hartman thought she was "into it" this might create an escape opportunity. M.W., however, was not "going along" with the sexual activity on the occasions when Mr. Hartman completed the described penis/vaginal penetration. M.W.'s testimony, when viewed in its entirety, established the element of force as to each rape count.

*Id.*, pgs. 10-11.

**{¶ 22}** Hartman was sentenced to four years of imprisonment for each of the three counts of Rape, to be served concurrently. Hartman was also designated as a tier three sexual offender, requiring lifetime registration requirements, pursuant to Chapter 2950 of the Revised Code. Hartman appeals from his conviction and sentence.

### III. The Convictions Are Supported By Sufficient Evidence

**{¶ 23}** Hartman's First Assignment of Error asserts as follows:

THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN THE CONVICTIONS.

**{¶ 24}** Hartman was indicted for three counts of Rape, in violation of R.C.

2907.02(A)(2). Under this section, to obtain a conviction for Rape, the State must prove beyond a reasonable doubt that the accused engaged in sexual conduct with another by purposely compelling the other person to submit to the sexual conduct by force or threat of force. Hartman has admitted that he engaged in sexual conduct with another. The question is whether sufficient evidence was presented to prove beyond a reasonable doubt that he purposely compelled M.W. to submit to the sexual conduct by force or threat of force.

{¶ 25} A challenge to the sufficiency of the evidence presents a question of law as to whether the State has presented adequate evidence on all elements of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jackson*, 2d Dist. Montgomery No. 26050, 2015-Ohio-5490, ¶ 41, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 26} Pursuant to R.C. 2901.22 (A), "[a] person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." Therefore, in a Rape case, to prove that the defendant acted "purposely," the

State must prove that it was the defendant's intention to engage in sexual conduct by forcefully compelling the other person to submit to the sexual conduct. "A rape occurs only if the perpetrator purposely compels the other to submit by force or threat of force." *State v. Wilkins*, 64 Ohio St.2d 382, 385, 415 N.E.2d 303 (1980).

{¶ 27} Ohio's rape statute does not require proof of the victim's lack of consent. Ohio law does recognize certain victims incapable of giving consent, based on mental or physical incapacity. Those exceptions do not apply in the case before us. *See, e.g., State v. Hillock*, 7th Dist. Harrison No. 02-CA-538, 2002-Ohio-6897. Consent is not an affirmative defense, but when applicable, consent is used as a defense to challenge the State's evidence on the element of purposeful force or compulsion. *State v. El-Berri*, 8th Dist. Cuyahoga No. 89477, 2008-Ohio-3539, ¶ 57. When consent is raised as a defense to a charge of Rape, the test of whether consent negates a finding of force is not whether a reasonable person confronted with similar circumstances would have understood that the victim did not consent, the test requires the trier-of-fact to find, beyond reasonable doubt, that the specific defendant's purpose or intent was to commit the crime of rape. *State v. Mundy*, 99 Ohio App.3d 275, 650 N.E. 2d 502 (2d Dist. 1994). As we discussed in *Mundy*:

> The determination of a defendant's mental state, absent some comment on his or her part, must of necessity be determined by the nature of the act when viewed in conjunction with the surrounding facts and circumstances. *State v. Lott* (1990), 51 Ohio St.3d 160, 168, 555 N.E.2d 293, 302. This is, in fact, the well-recognized process of inferential reasoning. This process by necessity incorporates an objective mechanism

or standard in determining the defendant's state of mind by the use of circumstantial evidence. The trier of fact reviews the defendant's conduct in light of the surrounding facts and circumstances and infers a purpose or motive.

*Id.,* 99 Ohio App.3d at 288, 650 N.E.2d 502.

{¶ 28} R.C. 2901.01(A)(1) defines "force" as any "violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." In the case before us, the trial court did not find that Hartman used physical constraint or any form of violence that caused physical harm during the sexual encounter. The trial court did not find that Hartman constrained the victim in any way or that the victim exhibited physical resistance to Hartman's advances. However, the trial court did find that Hartman "pushed" M.W. onto the bed, removed her clothes, laid on top of her, and pulled her into the shower. It has been recognized that proof of physical violence or physical resistance is not required to establish Rape if the defendant creates in the mind of the victim the belief that physical force will be used if the victim does not submit. *State v. Umphries*, 4th Dist. Ross No. 11CA3301, 2012-Ohio-4711, ¶ 21, and ¶ 16, citing *State v. Schaim*, 65 Ohio St. 3d 51, 55, 600 N.E. 2d 661 (1992). "The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988). "Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Umphries* at ¶16, quoting *State v. Fowler*, 27 Ohio App.3d 149, 154, 500 N.E .2d 390 (8th Dist. 1985).

{¶ 29} In the case before us, the victim testified that her will was overcome by fear, because she believed she would be hurt if she did not submit to Hartman's advances. To find that her will was overcome by fear, the trier-of-fact must have sufficient evidence from which to infer that her fear was based on some wrongful action or conduct of the defendant that purposely compelled her to submit to the sexual conduct, against her will. In the case before us, the trial court stated, "that the force element must be viewed within the context of M.W.'s concerns regarding Mr. Hartman's size and strength, that Mr. Hartman was intoxicated, that she did not know Mr. Hartman, and that, as the sexual conduct was occurring, she did not know the location of the remaining occupants of the house." Dkt. #80, pg. 10.

{¶ 30} Hartman testified that he is 6'3", weighed 200 pounds, and was physically fit. Medical records reflected that M.W. is 5'3" and weighed 165 pounds. Hartman and M.W. were both 20 years old, and both were college students. The victim testified that she was scared because she was not as strong as Hartman, and she believed that he would use his superior strength to hurt her if she did not submit to his sexual advances. The victim testified that she repeatedly said "No" to Hartman during the sexual encounter. The physical force described by the victim included her testimony that Hartman "pushed" her onto the bed, removed her clothing, laid on top of her, and "pulled" her into the shower.

{¶ 31} Each of the cases cited by the State addressing the issue of force is distinguishable from the case before us. In *Umphries*, the victim felt compelled to submit out of fear when she awoke during the night to find her uncle on top of her, who had broken into the house through a window, and she begged him to stop. *State v. Umphries*, 4th Dist.

Ross No. 11CA3301, 2012-Ohio-4711. There was no admission that the victim in *Umphries* was a willing participant to any part of the encounter, and she communicated her fear by begging him to stop. *Id.* The victims in *Whitt, Shannon,* and *Eskridge* were minors. *State v. Whitt*, 8th Dist. Cuyahoga No. 82293, 2003-Ohio-5934; *State v. Shannon,* 11th Dist. Lake Nos. 2002-L-007, 2002-L-008, 2004-Ohio-1669; *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988). In *State v. Patel*, we found sufficient evidence of force when an employer held his employee "in a locked bathroom and inserted his finger in her vagina against her will and while ignoring her plea to stop."  *State v. Patel*, 2d Dist. Greene No. 2010CA77, 2011-Ohio-6329, ¶ 63.   Unlike in the case before us, the defendant in *Patel* locked the room to prevent the victim from leaving, and no part of the sexual encounter was consensual. *Id.* None of the cited cases present a fact pattern in which a sexual encounter between adults starts out as consensual, before changing into a non-consensual encounter.

{¶ 32} We agree that the elements of Rape can be established when the two participants start the sexual encounter on a consensual basis, but the consent is revoked by words, actions or conduct that clearly communicates non-consent, the defendant fails to respect the change in consent, and purposely proceeds to engage in sexual conduct through force or threat of force evidenced by violence, physical restraint, or some type of coercive or threatening conduct that creates a belief or fear that physical force will be used if the victim does not consent.   In the case before us, both the defendant's physique -- he was bigger and stronger than his victim -- and his conduct of pushing the victim on the bed, removing her clothes, and pulling her into the shower, was evidence from which a reasonable finder of fact could find that he purposely acted in a manner that induced fear

in the victim, compelling her to submit to his sexual conduct, against her will.

{¶ 33}  Based on our review of the record, we conclude that the State did present sufficient evidence from which the trier of fact could conclude that Hartman purposely compelled M.W. to submit to sexual conduct by force or threat of force.  There is no dispute that it was Hartman's intention to engage in sexual conduct with M.W.   Also, the testimony of the victim, if believed, supports a finding that Hartman used force to compel M.W. to submit to sexual conduct at least three times during the course of the evening. Hartman's First Assignment of Error is overruled.

### IV. Overruling the Motion for a New Trial Was Not an Abuse of Discretion

{¶ 34} Hartman's Second Assignment of Error asserts:

THE COURT ERRED WHEN IT DENIED HARTMAN'S MOTION FOR A NEW TRIAL

{¶ 35}  Pursuant to Crim. R. 33(A)(4), a new trial may be granted "if the verdict is not sustained by sufficient evidence or is contrary to law."   The decision whether to grant a motion for a new trial lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *State v. Hayden*, 2d Dist. Montgomery No. 26524, 2015-Ohio-3262, ¶ 30, citing *State v. Schiebel,* 55 Ohio St.3d 71, 564 N.E.2d 54 (1990).   An "abuse of discretion" implies an arbitrary, unreasonable, or unconscionable attitude on the part of the court. *State v. Ulery*, 2d Dist. Clark No. 2010-CA-89, 2011-Ohio-4549, ¶ 9, citing *State v. Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 (1980). "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue

de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *State v. Rossi*, 2d Dist. Montgomery No. 24740, 2012-Ohio-2545, ¶ 12, citing *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 36} Hartman asserts three separate arguments related to alleged errors in the trial court's denial of his motion for his new trial. The first two arguments are both concerned with the evidence utilized by the trial court to conclude that the element of force was established by proof of the victim's subjective thoughts and concerns instead of the defendant's conduct. As discussed above, lack of consent is not an element to prove the offense of Rape, but it is a relevant factor in determining whether force was used to compel the victim to submit to the sexual conduct against her will. In the decision denying the motion for a new trial, the trial court did not rely solely on the victim's conduct, thoughts or subjective point of view in concluding that Hartman's conduct was sufficient to induce the victim's fear. The trial court looked at the totality of the circumstances, including the relative size and strength of the defendant and his victim, Hartman's physical contact with the victim when he pushed and pulled her, removed her clothes and laid on top of her, his conduct in ignoring the victim's repeated verbal statements of "No," the victim's unfamiliarity with her surroundings, and the victim's reaction to her fears. The trial court, as the trier of fact, could reasonably infer from the totality of the circumstances, and from the victim's testimony, that she was too scared to resist, and that Hartman compelled her to submit to his sexual conduct against her will.

{¶ 37} Hartman also argues that the trial court's decision denying the motion for a

new trial erroneously concluded that three separate instances of rape occurred by penile penetration, which conflicted with the trial court's earlier pronouncement that the convictions were based on one instance of digital penetration and two instances of penile penetration. Hartman argues that the trial court's revision of the type of sexual conduct proven to establish the three charges of Rape shows that the evidence was insufficient to support the convictions, and that the trial court therefore abused its discretion by denying the motion for a new trial. As noted earlier, the record does support the conclusion that the State presented sufficient evidence to allow the trier of fact to find, beyond a reasonable doubt, that Hartman committed three offenses of Rape. Accordingly, the trial court did not err by overruling the motion for a new trial, notwithstanding possible confusion by the trial court, in ruling on the motion, as to the particular offenses comprising the three Rape convictions. Hartman's Second Assignment of Error is overruled.

**V. The Convictions Are Not Against the Manifest Weight of the Evidence**

{¶ 38} For his Third Assignment of Error, Hartman asserts:

HARTMAN'S CONVICTION IS AGAINST THE MANIFEST WEIGHT

OF THE EVIDENCE.

{¶ 39} In determining whether a verdict is against the manifest weight of the evidence, we are required to review the entire record, to weigh the evidence and all reasonable inferences, and to consider the credibility of the witnesses. *State v. Jackson*, 2d Dist. Montgomery No. 26050, 2015-Ohio-5490, ¶ 48, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 39. In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror."

*Id.* at ¶ 49*,* citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier-of-fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*

{¶ 40} Unlike the sufficiency-of-evidence standard of review, a reviewing court does not construe the evidence most strongly in favor of the prosecution when using a manifest-weight standard of review. *State v. Woullard,* 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E. 2d 964 (2d Dist.). A manifest-weight-of-the-evidence argument questions the believability of the evidence and asks a reviewing court to determine which of the competing inferences is more believable. *Id.* "However, the appellate court may not substitute its judgment for that of the trier-of-fact on the issue of the credibility of the witnesses unless it is patently apparent that the factfinder lost its way." *Id.* at ¶ 81, citing *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 41} In *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684 (August 22, 1997), we explained:

[B]ecause the factfinder ... has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

{¶ 42} In the case before us, we must give substantial deference to the trial judge,

who acted as the trier of fact, and who had the opportunity to see and hear the witnesses in judging their credibility. We find nothing in the record from which to conclude that the trial judge patently lost his way in finding the victim to be a more credible witness than the defendant. Although both the victim and the defendant were drinking alcohol prior to the sexual encounter, which may have affected their memory of the event, we do not find sufficient indicia of untruthfulness in the victim's recollection of the events, or the other witnesses who supported her testimony, that would require the trier of fact to find that her testimony lacked credibility. "The trier of fact is better situated than an appellate court to view witnesses and to observe their demeanor, gestures, voice inflections and to use those observations in weighing credibility." *State v. Jackson,* 2d Dist. Montgomery No. 26050, 2015-Ohio-5490, ¶ 50, citing *State v. Lewis*, 4th Dist. Scioto No. 01CA2787, 2002 WL 368625 (Feb. 25, 2002). Hartman argues that the victim's trial testimony and the statements she made the day after the incident contain several inconsistencies and admissions that should destroy her credibility. Hartman argues that the victim made an admission of her lack of recall in a text to her friend, which stated, "I can't even remember things because I was so in shock. I'm not sure if he did it [or] not. And in between." The State suggests that this comment was made in reference to her memory of whether Hartman was using a condom, or whether he completed the act of sexual intercourse. "A trier of fact is free to believe all, part or none of the testimony of each witness." *Id.*, citing *State v. Long*, 127 Ohio App.3d 328, 713 N.E.2d 1 (4th Dist.1998). In the case before us, the trier of fact was in the best position to judge the victim's credibility on the version of the facts she gave from the witness stand at the time of trial.

{¶ 43} The outcome of this case rested on the credibility of the witnesses.

Respecting the trial court's judgment on credibility, we conclude that the convictions are not against the manifest weight of the evidence. This is not the exceptional case in which the finder of fact lost its way. Hartman's Third Assignment of Error is overruled.

## VI. Ineffective Assistance of Counsel

{¶ 44}  In all of the following assignments of error, Hartman alleges that he was denied the effective assistance of counsel:

IV.  COUNSEL WAS INEFFECTIVE WHEN HE ADVISED HARTMAN TO GIVE THE POLICE A WRITTEN STATEMENT AND TO SUBMIT TO TWO ROUNDS OF QUESTIONING

V. TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO MOVE TO DISMISS THE INDICTMENT

VI. TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO REQUEST A BILL OF PARTICULARS

VII. TRIAL COUNSEL WERE INEFFECTIVE IN CROSS-EXAMINATION WHEN THEY INTRODUCED EVIDENCE ON ELEMENTS THE STATE HAD FAILED TO PROVE, HEARSAY, AND OTHERWISE INADMISSIBLE EVIDENCE

VIII. DEFENSE COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO OBJECT TO HEARSAY INTRODUCED BY THE STATE

IX.  COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO INVESTIGATE THE CASE

{¶ 45} In order to prevail on a claim of ineffective assistance of counsel, a defendant

must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Two elements must be demonstrated: 1) that counsel's representation fell below an objective standard of reasonableness; and 2) that counsel's errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the proceeding would have been different. *Id.* In our review of an ineffective assistance of counsel claim, "we will not second-guess trial strategy decisions, and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *State v. English*, 2d Dist. Montgomery No. 26337, 2015-Ohio-1665, ¶ 10, quoting *State v. Mason*, 82 Ohio St.3d 144, 157-158, 694 N.E.2d 932 (1998).

**{¶ 46}** Hartman argues six different grounds for establishing that he was denied the effective assistance of counsel guaranteed by the Sixth Amendment. Hartman claims that his counsel was ineffective when he was directed to provide a written statement to the police, and to cooperate fully in a police interrogation. In hindsight, Hartman is able to identify that this strategy of his defense counsel to fully cooperate with the investigation against him caused difficulty in defending inconsistent statements that may have impacted his credibility at trial. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, ¶ 37 (2d Dist.), citing *Strickland, supra*; *State v. Parker,* 2d Dist. Montgomery No. 19486, 2003-Ohio-4326, ¶ 13. Throughout the trial, it is apparent that the defense strategy was to

prove that the victim consented to the sexual conduct, and that Hartman did not purposely force her to submit to the sexual conduct. Both his written statement and the statements Hartman made to the police consistently asserted that the victim had consented to the sexual encounter. Hartman and M.W. are the only two witnesses to the sexual conduct, which would inevitably lead to a question of which witness to believe. It was reasonable, in light of counsel's perspective at the time, to pursue a strategy not to let the victim's version of events go unanswered in the investigative stage. We conclude that counsel's strategy of cooperation with the police investigation, under the circumstances of this case, did not constitute ineffective assistance of counsel.

{¶ 47} We also conclude that Hartman was not denied the assistance of effective counsel when defense counsel failed to file a motion to dismiss the indictment. The indictment charging Hartman with three counts of Rape did contain all the elements of the offenses set forth in the Rape statute, R.C. 2907.02(A)(2). Although the indictment did not include the name of the victim and the nature of the sexual conduct, the name of the alleged victim was never in question, and the nature of the sexual conduct would have been available to defense counsel by moving for a bill of particulars. While it may be argued, again from hindsight, that defense counsel should have moved for a bill of particulars, Hartman has not established that he was prejudiced by counsel's failure to do so. In his written statement, and in his trial testimony, Hartman admitted engaging in a sexual encounter that included digital penetration, vaginal, anal and oral intercourse with M.W., so disputing that sexual conduct occurred was not part of his defense. To establish that he was prejudiced, Hartman would need to establish that but for counsel's failure to move for a bill of particulars, there is a reasonable probability that the outcome of the

proceeding would have been different. As discussed above, the guilty verdicts in this case resulted from the trier of fact's decision to find the victim's testimony to be more credible. Under these circumstances, we conclude that the details provided by a bill of particulars would not have resulted in a reasonable probability of a different outcome.

{¶ 48} We agree with Hartman's assertion that defense counsel, on cross-examination of the victim, brought up factual matters not presented during the direct examination of the victim that may have helped the State prove the element of force. Specifically, the record reveals that defense counsel asked the victim to confirm that Hartman was "restraining" her, Trial Transcript at 74-75, that Hartman pinned her arms down, Trial Transcript at 75-76, that Hartman held his forearm across her chest, Hartman grabbed her wrists, grabbed her arm, and "was doing that forcefully," Trial Transcript at 80-81. We have held that "trial counsel's decision to cross-examine a witness and the extent of such cross-examination are tactical matters." *State v. Russell*, 2d Dist. Montgomery No. 21458, 2007-Ohio-137, ¶ 55. "A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *Id.*, citing *State v. Cook,* 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992). Because it was at least arguable that the State had presented sufficient evidence of force relating to at least one of the Rape counts – the last one occurring on the bed – trial counsel could reasonably have concluded that it would not be

safe to eschew cross-examination on the element of force.[2]

{¶ 49} It appears that the strategy of defense counsel asking the victim about facts relevant to the issue of force was an attempt to attack her credibility based on different versions of the events she provided to the sexual assault nurse, to the detective, and during direct examination at trial. In a case that rests entirely on the credibility of the witnesses, a strategic choice to conduct cross-examination of the victim on factual issues relating to elements of the offense is not automatically ineffective assistance of counsel. In the case before us, it was a valid defense strategy to attack the credibility of the victim through the use of prior inconsistent statements, a well-established trial strategy. *See* Evid. R. 613. We conclude that Hartman was not denied the effective assistance of counsel when reasonable trial strategy was utilized to challenge the victim's credibility through a cross-examination technique of raising inconsistent statements.

{¶ 50} Hartman also argues that his counsel was ineffective based on his failure to object to inadmissible hearsay from the testimony of the victim's friend, Courtney, the sexual assault nurse, and the detective who interviewed the victim at the hospital. With respect to the victim's friend, Courtney, Hartman claims that his counsel should have objected to inadmissible testimony regarding the character of the victim, including her demeanor immediately after the incident, and to specific statements made by the victim the following morning. While opinions elicited to prove that a victim is being truthful are generally inadmissible, a distinction has been made for testimony "which is additional support for the truth of the facts testified to by the [victim], or which assists the fact finder

---

[2] In fact, since the three Rape sentences were ordered to be served concurrently, acquittal on two of the Rape charges would have amounted to a Pyrrhic victory.

in assessing the [victim's] veracity." *State v. Sedgmer*, 7th Dist. Harrison No. 00 522 CA, 2002-Ohio-1527, ¶ 23, citing *State v. Stowers,* 81 Ohio St. 3d 260, 690 N.E. 2d 881 (1998). In the case before us, defense counsel did not err by failing to object to testimony that was admissible to assist the trier-of-fact in assessing the victim's veracity.

**{¶ 51}** With respect to the sexual assault nurse, Hartman argues that counsel's failure to object to the nurse's inadmissible hearsay was prejudicial. The hospital's designated sexual assault nurse did testify as to statements made by the victim, after the victim had been examined by an ER doctor, so that at the time of the interview a medical diagnosis had already been completed. The nurse testified that her examination of the victim was to look for injury that could be consistent with force. Trial Transcript at 177-178. In response to the victim's statements, the sexual assault nurse took samples of the victim's DNA in order to complete a rape kit, which was to assist law enforcement, not for medical diagnosis. Ohio licensing law limits a registered nurse's role to assessing the patient for the purpose of providing nursing care, and a nursing diagnosis is limited to "identification of a patient's needs or problems which are amenable to nursing intervention." R.C. 4723.01; O.A.C. 4723-4-01.   The victim's statements to a nurse about the cause and origin of the injury is inadmissible hearsay, unless "the inception or general character of the cause of external source thereof is reasonably pertinent to diagnosis or treatment." Evid. R. 803(4). The only statements made to a nurse by a victim that are admissible under Evid. R. 803(4) are statements made for the purpose of nursing diagnosis or treatment. Therefore, a nurse's testimony concerning statements made by a rape victim, recorded by the nurse for the purpose of assisting a criminal investigation, and not for nursing treatment or diagnosis, is inadmissible hearsay.

{¶ 52} In the case before us, the nurse did not testify that the victim had any injuries requiring nursing treatment, or that she provided treatment. Even though defense counsel failed to object to the nurse's testimony or the admission of the nurse's report, Ex. 20, we conclude that this was not sufficiently prejudicial to have affected the outcome of the trial. The verdicts rested on the credibility of the victim, and no part of the nurse's testimony was essential to the trier of fact's finding that all elements of the offense of Rape had been established through the victim's testimony. Therefore, we conclude that Hartman was not denied effective assistance of counsel by counsel's failure to object to the nurse's testimony.

{¶ 53} Hartman also argues that his counsel was ineffective by having failed to object to the hearsay evidence admitted through the testimony of the detective. The State concedes that it was hearsay when the detective testified regarding the statements made during his interview of the victim. The State does not argue that these statements were admissible through any exception to the hearsay rule, such as an excited utterance allowed by Evid. R. 803(2), or a present-sense impression under Evid. R. 803(1). The only question under this assignment of error is whether the admission of this hearsay was prejudicial. This question must be viewed in the same manner discussed above regarding the defense strategy to cross-examine the victim regarding prior inconsistent statements, which included the statements she made to the detective. As we have already concluded, it was a reasonable defense strategy to allow the admission of the victim's various statements of the incident in order to challenge the victim's credibility by pointing out inconsistencies in these pre-trial statements with her testimony at trial. We conclude that Hartman was not denied effective assistance of counsel as a result of counsel's

strategic decision not to object to the detective's testimony in order to allow the admission of inconsistent statements by the victim.

{¶ 54} Hartman also argues that counsel was ineffective as a result of counsel's failure to investigate the case. Hartman claims that prior to trial his counsel failed to interview the victim's friend, Courtney, and the lab witness, Squibb. Hartman also claims that his counsel was ineffective as a result of counsel's failure to seek discovery of the notes of the forensic analyst who actually conducted the DNA tests, Emily Draper, or to obtain the video recordings of Hartman's police interviews. We agree that defense counsel has an obligation to conduct a reasonable pre-trial investigation sufficient to develop appropriate defense strategies. *State v. Ayers*, 5th Dist. Licking No. 98 CA 53, 1999 WL 3976 (Nov. 25, 1998), citing *State v. Johnson*, 24 Ohio St. 3d 87, 494 N.E.2d 1061 (1986), and 1 A.B.A. Standard for Criminal Justice (1982 Supp.), No. 4-4.1. The defense strategy in this case was focused on defeating the State's claim that Hartman purposely forced M.W. to submit to sexual conduct. This strategy necessitated an attack on the victim's credibility, and evidence to bolster Hartman's credibility. As discussed above, Courtney's testimony was offered to support the victim's credibility. Therefore, defense counsel's investigation should have included an interview with Courtney to develop a reasonable defense strategy to discredit her testimony. Notwithstanding the failure to interview Courtney, defense counsel did make appropriate objections during her testimony to challenge the admissibility of hearsay and the admissibility of Courtney's observations of the victim's demeanor after the incident to bolster the victim's credibility. We conclude that the failure to interview Courtney before trial was not sufficiently prejudicial to warrant reversal.

**{¶ 55}** The failure to conduct a pretrial interview of Squibb did not amount to ineffective assistance of counsel. Since defense counsel had no advance notice that Squibb would be called to testify instead of Draper, the analyst who actually conducted the DNA tests, it cannot be concluded that counsel failed in the duty to conduct a pre-trial interview of an unnamed witness. In pre-trial discovery, defense counsel was provided with the lab report prepared by Draper, but failed to seek any additional documents from the lab, including Draper's lab notes, which could have helped counsel prepare an effective cross-examination to challenge the procedures followed by the lab. The potential for challenging the lab procedure was fully explored in the post-trial hearing on the motion for a new trial, but did not result in any evidence that would have supported the reasonable probability of a different outcome in the trial. Therefore, the failure to seek discovery of Draper's lab report notes was not shown to be prejudicial.

**{¶ 56}** Hartman also claims that defense counsel's failure to review the sexual assault evidence kit caused surprise during the trial -- that the kit contained untested samples of fingernail scrapings and DNA from the victim's mouth. However, Hartman has not established how this additional discovery would have helped his defense. Additional DNA testing was not necessary to establish that it was Hartman who participated in the sexual encounter with M.W., which Hartman admitted when he first gave a statement to police, and never thereafter disputed. Hartman has not shown that additional testing would assist in his defense that M.W. consented to the sexual encounter. We conclude that Hartman has not established that he was prejudiced by his counsel's failure to pursue additional discovery from the rape kit.

**{¶ 57}** We also conclude that Hartman has not shown prejudice by his counsel's

failure to obtain a copy of the video recorded interrogations with the detective from the Oakwood Police Department. Defense counsel was present with Hartman at the time of the interviews, which should have adequately prepared counsel for making strategic plans to cross-examine the detective, and to prepare Hartman for potential cross-examination during his trial testimony. Hartman has not established how discovery of the video recordings would have led to a different outcome at trial.

{¶ 58} Hartman's Fourth through Ninth Assignments of Error are overruled.

## VI. Cumulative Effect of Counsel's Errors

{¶ 59} For his Tenth Assignment of Error, Hartman asserts:

THE CUMULATIVE EFFECT OF COUNSEL'S ERRORS DENIED HARTMAN A FAIR TRIAL AND RENDERED THEIR ASSISTANCE INEFFECTIVE

{¶ 60} The Supreme Court of Ohio in *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus, recognized the doctrine of cumulative error. Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal. *Id.* at 196-197. *See also State v. Jackson*, 141 Ohio St.3d 171, 2014–Ohio–3707, 23 N.E.3d 1023, ¶ 258; *State v. McGail,* 2d Dist. Miami No. 2014-CA-27, 2015-Ohio-5384, ¶ 81; *State v. Royster*, 2d Dist. Montgomery No. 25870, 2015-Ohio-3608, ¶ 56.

{¶ 61} The Supreme Court of Ohio has recognized that multiple errors, when aggregated, may violate a defendant's right to a fair trial, even when those errors are

determined to be harmless when separately considered. *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). To find cumulative error, we first must find multiple errors committed at trial, and secondly, we must conclude that a reasonable probability exists that the outcome of the trial would have been different but for the combination of the harmless errors. *Id.* at 398. *See also State v. Zimpfer*, 2d Dist. Montgomery No. 26062, 2014-Ohio-4401, citing *State v. Thomas*, 2d Dist. Clark No. 2000-CA-43, 2001 WL 1103328 (Sept. 21, 2001).

**{¶ 62}** Based upon our above discussion of the alleged instances of ineffective assistance of counsel, we conclude that the instances of arguably ineffective assistance of counsel, even when considered cumulatively, do not give rise to a reasonable probability of a different result, had they not occurred. Hartman's Tenth Assignment of Error is overruled.

## VII. The Indictment Was Sufficient

**{¶ 63}**  For his Eleventh Assignment of Error, Hartman asserts:

THE INDICTMENT IS CONSTITUTIONALLY INSUFFICIENT

**{¶ 64}**  For each of the three charges of rape, the indictment states:

> Mark Hartman, on or about December 31, 2013 in the County of Montgomery, aforesaid and the State of Ohio, did engage in sexual conduct with another, by purposely compelling the other person to submit by force or threat of force; contrary to the form of the statute (in violation of Section 2907.02(A)(2) of the Ohio Revised Code) in such case made and provided, and against the peace and dignity of the State of Ohio.

{¶ 65} The language of the indictment charging Hartman with three counts of Rape does contain all the elements of the Rape statute, R.C. 2907.02(A)(2). The Supreme Court of Ohio has held that "[a]n indictment meets constitutional requirements if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.' " *State v. Childs*, 88 Ohio St.3d 558, 565, 728 N.E.2d 379 (2000), quoting *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). In *Childs*, the Court recognized that an indictment is generally acceptable if citing the actual language of the statute, unless it inadequately notifies the defendant of the charge and the severity of the penalty. More recently, in *State v. Jackson*, 134 Ohio St.3d 184, 2012-Ohio-5561, 980 N.E.2d 1032, the Supreme Court of Ohio confirmed this holding and found that a charge for aggravated trafficking was sufficient, without listing the specific drug involved, as long as the indictment identified the statutory schedule, I through V, in which the drug was listed as it made a difference to the severity of the penalty. *Id.* at ¶ 21.    Hartman alleges that the indictment is insufficient because it does not identify the name of the victim, and does not identify the nature of the sexual conduct for each of the three charges.   Hartman argues that without these specifics, the indictment fails to adequately notify him of the charges against him, and subjects him to the possibility of additional charges, which would impair his protection from a potential Double Jeopardy violation.

{¶ 66} The Supreme Court of Ohio has held that when an objection to an indictment is not raised prior to trial as required by Crim. R. 12(C)(2), it is waived, unless it constitutes plain error. *State v. Skatzes,* 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 26,

citing *State v. Frazier*, 73 Ohio St.3d 323, 332, 652 N.E.2d 1000 (1995). According to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."   Plain error is not found unless it can be concluded that but for the error, the outcome of the trial would have been different. *State v. Waddell,* 75 Ohio St.3d 163, 166, 661 N.E. 2d 1043 (1996).   Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Haney,* 12th Dist. Clermont No. CA2005-07-068, 2006-Ohio-3899, ¶ 50, quoting *State v. Long,* 53 Ohio St.2d 91, 372 N.E. 2d 804 (1978), paragraph three of the syllabus.

{¶ 67} As we concluded above, since the name of the victim was undisputed, Hartman was not harmed by the failure to identify the name of the victim in the indictment. We have held that the indictment in a rape case with multiple counts "was sufficient because it paralleled the language of the statutes, including every element of each charge. Because the nature of the sexual acts had no bearing on the identity or severity of the offenses, the specific acts were not essential elements of the crimes and therefore were not required to be set forth in the indictment." *State v. Shaw*, 2d Dist. Montgomery No. 21880, 2008-Ohio-1317, ¶ 20.

{¶ 68}  Although the failure to identify the nature of the sexual conduct, in this case, does not affect the severity of the penalty for Rape, it does raise potential Double Jeopardy concerns.   For example, Hartman admitted that he engaged in both oral and anal intercourse with the victim, but the State did not attempt to prosecute either of these potential offenses in the present case.   In closing arguments, the State argued that the first count of Rape was supported by evidence of digital penetration, and the second and

third counts were supported by evidence of penile penetration. Trial Transcript at 494. However, in the entry overruling the motion for a new trial, the trial court stated that all three counts were proven by penile penetration. Under the facts of this case, without identifying the specific sexual conduct in the language of the indictment, the State might consider pursuing a second prosecution for the digital penetration or the oral or anal intercourse. As we concluded in *Shaw, supra,* the failure of the indictment to notify the defendant of the nature of the sexual conduct upon which each of his convictions were based prevents a retrial for any of the potential offenses that occurred during the same time span covered by the indictment. *Id.* at ¶ 25. As addressed by the Supreme Court of Ohio in *State v. Anderson*, 138 Ohio St. 3d 264, 2014-Ohio-542, 6 N.E. 3d 23, ¶ 59, the proper time for raising a Double Jeopardy violation is after a second indictment is issued and a motion to dismiss the indictment is decided. We cannot find that the potential for a future Double Jeopardy problem is grounds for reversal of a conviction that does not involve a current Double Jeopardy violation. In other words, we cannot conclude that but for the defective indictment error, the outcome of this trial would have been different. We conclude that failure to object to the indictment prior to trial, in accordance with Crim. Rule 12, waived this error on appeal. Consequently, Hartman's Eleventh Assignment of Error is overruled.

## VIII. Admission of Evidence to Establish Demeanor

## Was Not an Abuse of Discretion

{¶ 69} For his Twelfth Assignment of Error, Hartman asserts:

THE TRIAL COURT ERRED WHEN IT ADMITTED AND RELIED

ON IRRELEVANT AND INADMISSIBLE DEMEANOR-AFTER-THE-FACT

EVIDENCE

**{¶ 70}** The Supreme Court of Ohio has held that the admission or exclusion of evidence is within the sound discretion of the trial court and that, unless the trial court clearly abused its discretion and a party was materially prejudiced as a result, reviewing courts should be slow to interfere. *State v. Byrd*, 2d Dist. Montgomery No. 25842, 2014-Ohio-2553, ¶ 26, citing *State v. Hymore,* 9 Ohio St. 2d 122, 224 N.E. 2d 126 (1967). A trial court abuses its discretion when it makes a decision that is unreasonable, arbitrary, or unconscionable. *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 24.

**{¶ 71}** The record reflects that the trial court overruled three objections to testimony of the victim and her friend Courtney describing how M.W. changed after the alleged rapes. No expert testimony was offered to substantiate that the sexual incident was the direct and proximate cause of M.W.'s psychological distress after the sexual encounter. Hartman argues that testimony regarding the alleged impact on the victim was not relevant to the material issues in the case, and was highly prejudicial. On the record, the trial court overruled an objection to a question directed to the victim asking "[A]fter that day how did you change?" as follows:

MR. CONARD: Objection, Your Honor. No foundation.

THE COURT: Further, I do not see the relevance. What's the relevance of this?

MS. MULLINS: Your Honor, it's to show how a tragic situation changed her demeanor and her personality. It goes to when someone goes through a

tragic situation, they change. It goes to show that.

THE COURT: How does make - - I'll allow just a little bit of this. But, again, it seems to me that her change in demeanor, it has to be directed toward whether - - proving that the events she has described more probably happened. That's the only reason it could be relevant; is that if those changes in her demeanor makes it more likely that the events that have been described occurred. I don't want this for any form of sympathy.

MS. MULLINS: No, Your Honor.

THE COURT: All right. Go ahead.

MS. MULLINS: [M.W.], how did your demeanor, how did your personality change from before this happened to after this happened?

MR. CONARD: Your honor, I would renew my objection.

THE COURT:   And the basis?

MR. CONARD: It would be relevance.

THE COURT: And again, I think there is some minimal relevance to this under Evidence Rule 401, in that if this event did change her demeanor, her personality, that does make it perhaps slightly more likely that the events described occurred. So for that purpose and that purpose alone, I will allow this testimony.

Trial Transcript at 46-47.

**{¶ 72}**  The record also reflects that questions were asked of the victim's friend Courtney, about the victim's demeanor after the incident to bolster the victim's credibility. Again, the trial court admitted the bolstering testimony, stating as follows:

THE COURT: Again, I am going to allow it for the minimal purpose of – since this witness can testify to what [M.W.]'s personality was before the alleged incident and then after the incident. Not for any purposes of sympathy, but simply for purposes, under [Evid. R.] 401, of whether or not this change in personality makes the events more or less probable. For that purpose and that purpose alone.

Trial Transcript at pgs. 124-125.

{¶ 73} We conclude that the trial court properly found that the evidence of the victim's demeanor was probative. While admissible, the trier of fact is free to give little weight to the evidence. On this record, we conclude that the trial court, the trier of fact, as evidenced by its comments, did not give undue weight, or even much weight at all, in rendering its verdict. The alleged change in the victim's demeanor is but one of numerous facts that were considered by the trial judge in his conclusion that the victim was raped.

{¶ 74} Courtney's opinions regarding the victim's demeanor after the sexual encounter were rationally based on her perceptions of the victim's conduct, and helpful to a clear understanding of her testimony, because her conclusions were drawn from a close personal friendship with the victim, not just from the type of common experiences used by juries to draw reasonable inferences. The victim's testimony about her own personality changes was subject to cross-examination and was admissible under Evid. R. 401.

{¶ 75} In the case before us, the trial court did not abuse its discretion by admitting the testimony regarding a change in the victim's demeanor. Hartman's Twelfth Assignment of Error is overruled.

### IX. Admission of Hearsay Was Not Materially Prejudicial

**{¶ 76}**  For his Thirteenth Assignment of Error, Hartman asserts:

THE TRIER OF FACT'S ADMISSION AND CONSIDERATION OF THE OVERWHELMING AMOUNT OF HEARSAY IN THIS CASE REQUIRES REVERSAL

**{¶ 77}**  Hartman argues that the trial court improperly admitted hearsay evidence and that the hearsay was material to the outcome because the trial court announced the verdict in open court and in the written decision overruling the motion for a new trial, by stating that its decision was "based on the evidence presented."   We initially note that the "decision whether to admit or exclude evidence is within the sound discretion of the trial court, and 'unless the trial court clearly abused its discretion and a party was materially prejudiced as a result, reviewing courts should be slow to interfere.' " *Kademian v. Marger*, 2014-Ohio-4408, 20 N.E.3d 1176, ¶ 41 (2d Dist.), quoting *Waste Mgt. of Ohio, Inc. v. Mid-America Tire, Inc.*, 113 Ohio App.3d 529, 533, 681 N.E.2d 492 (2d Dist.1996). "The trial court has broad discretion to determine whether a declaration should be admissible as a hearsay exception." *State v. Everson*, 7th Dist. Mahoning No. 12 MA 128, 2016-Ohio-87, ¶ 27, quoting *State v. Dever*, 64 Ohio St.3d 401, 410, 596 N.E.2d 436 (1992).

**{¶ 78}** The fact that defense counsel did not object to this hearsay testimony at the time of trial requires us to utilize a plain error standard of review.   Plain error is not grounds for reversal, unless it is established that but for the error, the outcome of the trial would have been different. *State v. Waddell,* 75 Ohio St.3d 163, 166, 661 N.E. 2d 1043 (1996). "Notice of plain error 'is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *State v. Haney*,

12th Dist. Clermont No. CA2005-07-068, 2006-Ohio-3899, ¶ 50, quoting *State v. Long,* 53 Ohio St.2d 91, 372 N.E. 2d 804 (1978), paragraph three of the syllabus. Presuming that the trial court considered and relied on hearsay statements in reaching its verdict, we must determine if the effect was materially prejudicial such that the outcome would have been different had the hearsay been excluded.

{¶ 79} As discussed above, the trial court did admit statements made by the victim to the victim's friend, Courtney, to the sexual assault nurse, and to the detective who interviewed the victim. As we concluded above, it was a reasonable defense strategy not to object to this hearsay in order to establish prior inconsistent statements to attack the credibility of the victim during cross-examination. Hartman has not produced evidence of any other grounds for attacking the victim's credibility that could have been raised if the hearsay statements had not been admitted. Without the evidence of the prior inconsistent statements, the defense strategy to attack the victim's credibility would have been even more difficult, and less likely to result in an acquittal. Since we find no material prejudice to the admission of the hearsay statements, we do not find plain error or an abuse of discretion. Hartman's Thirteenth Assignment of Error is overruled.

## X. Scientific Testing May Be Admitted Through the Testimony of
## an Expert Who Did Not Conduct the Testing

{¶ 80} For his Fourteenth Assignment of Error, Hartman asserts:

THE ADMISSION OF MARK SQUIBB'S TESTIMONY IN VIOLATION OF CRAWFORD V. WASHINGTON, 541 U.S. 36 (2004) REQUIRES REVERSAL

**{¶ 81}** Hartman argues that the admission of scientific evidence through a witness who did not conduct the scientific test is structural error. Convictions based on structural errors, which involve a constitutional "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself," are subject to automatic reversal, regardless of whether harm or prejudice is shown. *Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). The State argues that the expert's testimony was not hearsay, because the DNA expert testified to his own actions in performing a peer review of the actual lab technician's report. The State also argues that a confrontation clause violation, if any, was waived when the defense failed to object to the testimony of the DNA expert at trial. The State also argues that any error was harmless. As discussed below, we conclude that our review of this assignment of error must be based on whether the error was waived or constitutes plain error.

**{¶ 82}** For purposes of the confrontation clause, it has been held that the contents of a laboratory report is testimonial in nature when its conclusion is prima facie evidence of an element of the offense. *Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009); *Bullcoming v. New Mexico*, 564 U.S. 647, 663-664, 131 S.Ct. 2705, 2716, 180 L.Ed.2d 610 (2011). However, the U.S. Supreme Court has also held that expert testimony from a forensic specialist about the findings of a DNA test that was not performed by the witness did not violate the defendant's right to confrontation because the testimony was offered for the purpose of explaining the assumptions on which the expert's opinion relied, and were not offered for the truth of the assumptions. *Williams v. Illinois*, ___ U.S. ___, 132 S. Ct. 2221, 183 L.E.2d 89 (2012). *See also State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 42. In the case before us, Hartman

challenges not only the admission of the lab reports, but his inability to cross-examine the witness who actually performed the DNA tests. The record supports that the DNA expert who did testify was unable to fully explain the reasoning for the process used to conduct the testing, which the witness did not conduct. "Fundamentally, the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court." *Melendez-Diaz v. Massachusetts,* 557 U.S. at 325. "[T]he [Confrontation] Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." *Bullcoming v. New Mexico*, 564 U.S. at 662.

{¶ 83} We agree that the record establishes that during trial, defense counsel did not object to the testimony of Squibb, the DNA expert, in place of Draper, the lab analyst who personally conducted the testing and interacted with the persons in law enforcement who requested the tests. We do not agree that counsel's failure to object automatically constitutes a waiver of his Sixth Amendment right to confrontation. We acknowledge that the Supreme Court of Ohio in *State v. Pasqualone,* 121 Ohio St. 3d 186, 2009-Ohio-315, 903 N.E. 2d 270, held that confrontation clause rights, like other constitutional rights, can be waived. Although the Court in *Pasqualone* was addressing the potential error of admitting a laboratory report, without the testimony of the person who prepared the report, the holding in *Pasqualone* rests entirely on a statutory provision, R.C. 2925.51, that specifically provides that defense counsel statutorily waives the right to insist on the testimony of the lab technician, if the procedure specified by the statute is not followed. Inapplicable to the case before us, R.C. 2925.51 only applies to testing done on drugs,

not DNA samples. The statute applicable to drug testing puts the defense on notice that they have a right and that it is waived if the procedure is not followed, which comports with the legal concept of waiver requiring a voluntary relinquishment of a known right. *In re B.N.C.*, 2d Dist. Montgomery No. 25615, 2013-Ohio-4071, ¶ 49. The U.S. Supreme Court in *Melendez-Diaz, supra,* commented that state statutes, such as R.C. 2925.51, do not run afoul of the confrontation clause when the effect of the statute is only to establish the procedural timing of when the right must be exercised. In the case before us, the State identified Emily Draper as the witness it intended to call to introduce the lab report and the DNA analysis. Dkt. #40. The defense had no prior notice that it would waive the right to cross-examine the lab technician if she did not show up for trial. However, by failing to object at trial when the State called Squibb instead of Draper, Hartman waived all but plain error. "Where preserved by objection, review of Confrontation Clause claims is for harmless error. Confrontation Clause claims not preserved by objection are reviewed for plain error." *State v. Habo*, 11th Dist. Portage No. 2012-P-0056, 2013-Ohio-2142, ¶ 35, citing *State v. Scott*, 10th Dist. Franklin No. 05AP-1144, 2006-Ohio-4981, ¶ 11, fn. 4.

{¶ 84} By claiming structural error, Hartman essentially argues that on this record, without the testimony of the analyst, prejudice is presumed. We disagree. The purpose of the testimony of the DNA expert was twofold; first, it proved that Hartman engaged in sexual intercourse with M.W., because his semen was found from a vaginal swab taken from M.W.; and secondly, that DNA testing of the bed comforter proved that there was movement of the two bodies on the comforter, as DNA evidence was found in numerous different spots. Hartman testified at trial, and did not dispute that he had sexual intercourse with M.W., so he was not prejudiced by the admission of the DNA lab report

or the testimony that explained the testing process. The evidence involving the comforter was also not prejudicial, because it was not probative to any element of the charged offenses, and may actually have supported Hartman's defense that the encounter was consensual, based upon a reasonable inference that M.W. was not held down or restrained during the sexual encounter. In closing arguments, Hartman's counsel did suggest that the testimony of the DNA expert be given little weight because, "when swabs were taken from [M.W.]'s mouth, they weren't tested. So, there's aspects of the investigation that appear to be incomplete as well that could have helped us in this path as we look for the truth." Trial Transcript at 520. If Hartman's argument is based on the possibility of evidence that was not provided by the State, that potential error does not constitute a confrontation-clause violation. "The state has no duty to gather exculpatory evidence. Moreover, it is wholly speculative whether further investigation would have uncovered potentially exculpatory evidence." *State v. Smith*, 2d Dist. Montgomery No. 20247, 2005-Ohio-1374, ¶ 12, citing *State v. Farris*, 2d Dist. Clark No. 2003 CA 77, 2004-Ohio-5980, ¶ 20. The defendant bears the burden to show that the evidence not produced was materially exculpatory, or that the failure to produce the evidence was based on bad faith, in order to demonstrate a due-process violation. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 74-77. Since Hartman has not raised a due-process argument, the issue of whether the lab should have tested the full rape kit to provide potentially exculpatory evidence to the defense is not before us. Hartman has not established that there is a reasonable possibility that had he been able to cross-examine the lab analyst there would have been a great likelihood of a different outcome.

{¶ 85} Even without the testimony of the DNA analyst, the trier-of-fact had

sufficient evidence to support each element of the charged offenses. Hartman has not established that but for a confrontation-clause error, the outcome of the trial would have been different. Accordingly, Hartman's Fourteenth Assignment of Error is overruled.

## XI. Cumulative Effect Of Multiple Errors Not Established

{¶ 86}  For his Fifteenth Assignment of Error, Hartman asserts:

THE CUMULATIVE EFFECT OF MULTIPLE ERRORS DENIED HARTMAN A FAIR TRIAL

{¶ 87}  Hartman argues that the cumulative effect of two or more errors should be grounds for reversing his convictions, even if the errors are determined to be harmless. The cumulative-error doctrine provides that a "conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E. 2d 623 (1995). "In order to find cumulative error, we must find: (1) that multiple errors were committed at trial, and (2) there is a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors." *State v. Goldblum*, 2d Dist. Montgomery No. 25851, 2014-Ohio-5068, ¶ 58.

{¶ 88}  Although we have found some basis for a claim of ineffective assistance of counsel, we have concluded that even when cumulated, the instances of ineffective assistance are insufficiently prejudicial to merit reversal. Similarly, when those instances are cumulated with the alleged deficiency in the indictment, and the alleged confrontation-clause violation, we still conclude that these alleged errors are not sufficiently prejudicial

to have created a reasonable probability of a different result, had the errors not occurred.

**{¶ 89}** Hartman's Fifteenth Assignment of Error is overruled.

## XII. Conclusion

**{¶ 90}** All of Hartman's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . .

WELBAUM, J., concurs.

HALL, J., concurring:

**{¶ 91}** I agree with the resolution of the issues reached in the lead opinion. I write separately to express my opinion that the right to confront DNA expert Draper was waived. Moreover, even if it was not, there is no showing that the use of the alternate test reviewer, Squibb, had any prejudicial effect.

. . . . . . . . . .

Copies mailed to:

Mathias H. Heck
Andrew T. French
S. Adele Shank
Lawrence J. Greger
Hon. Michael Tucker