[Cite as *State v. Arnold*, 2018-Ohio-3394.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27677 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-651 |
| | : | |
| DARION ARNOLD | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 24th day of August, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee

MARSHALL G. LACHMAN, Atty. Reg. No. 0076791, 75 N. Pioneer Boulevard, Springboro, Ohio 45066
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Darion Arnold was found guilty after a jury trial on one count each of rape, unlawful sexual conduct with a minor, gross sexual imposition, and sexual imposition. After merging the offenses, the trial court sentenced Arnold to 10 years in prison for rape. Arnold appeals from his conviction. The judgment of the trial court will be affirmed.

***Factual Background and Procedural History***

{¶ 2} Arnold is the first cousin of C.H., a female who has been diagnosed with developmental delays and related disorders that impede her cognitive functioning. From the age of six months, C.H. was raised by her maternal aunt, P.R. ("Mother"),[1] who also is Arnold's mother. C.H. and Arnold regard one another as siblings.

{¶ 3} On March 4, 2017, when C.H. was 13 years old and Arnold was 24, C.H., Arnold, Mother and Mother's seven-year-old daughter all lived together in the same house. That morning, Mother asked C.H. to go from the second floor to the basement to check on the laundry. Shortly after, Mother saw Arnold follow C.H. down the stairs.

{¶ 4} C.H. was gone longer than Mother expected, causing Mother to call down to ask C.H. what she was doing. When C.H. came upstairs soon after, Mother thought C.H. "smell[ed] funny" and noticed something on the back of C.H.'s jeans. After swiping the substance with her finger, Mother recognized it as semen. Pressed for an explanation, C.H. told Mother that Arnold "was doing sex." Mother directed C.H. to remove her jeans and change clothes while Mother placed the jeans in a plastic bag.

{¶ 5} Mother then took C.H. and Mother's younger daughter with her on a pre-

---

[1] P.R. testified that she views C.H. as "my daughter." (Tr. at 212.) Although P.R. has not adopted C.H., C.H. believes P.R. to be her mother and does not know otherwise. (Tr. at 213.)

planned errand before heading to the home of Mother's older daughter. From there, Mother called the Dayton police department, which instructed her to transport C.H. to Dayton Children's Hospital. After waiting for her older daughter's boyfriend to return from work with her daughter's vehicle, Mother used that vehicle to drive C.H. to Dayton Children's Hospital on the evening of March 4.

{¶ 6} At the hospital, a nurse and a police officer took C.H.'s jeans from the plastic bag that Mother had used and placed them into a paper bag. Brittanie Daugherty, a registered nurse who works in the emergency room at the hospital, testified that she was on duty when C.H. came to the hospital "for a possible sexual assault by her brother." Daugherty's shift began at 7:30 p.m. that day, and she testified that she saw C.H. later that evening. In relating her history for purposes of treatment, C.H. told Daugherty that her brother "did sex with her." Asked what that meant, C.H. reported that her brother had "put his penis in her butt" until "he ejaculated on her butt." Daugherty posed additional questions to determine whether her brother's penis actually had entered C.H.'s anus, and C.H. confirmed that Arnold's penis had gone "[i]nside of her body."

{¶ 7} On physical examination of C.H.'s perineal area, Daugherty detected a dried substance inconsistent with "normal vaginal secretions," that to her appeared to be dried semen. She did not see any evidence of anal injury or bleeding, but explained that assaults on pediatric patients are "typically not * * * violent," and bleeding from anal penetration may not be visible hours later. Daugherty identified C.H.'s pants that she and a police officer had placed into a paper bag at the hospital. She also identified the sexual assault examination kit that contained the swabs she used to collect samples from C.H.'s body for testing.

{¶ 8} Questioned about the events of March 4, C.H. testified that after she checked on the laundry at home, she went up to the first floor and stopped at the kitchen sink, trying to decide whether to wash the dishes. Arnold came up behind her at the sink, pulled down C.H.'s pants and underwear as well as his own, and "put his private in my butt" while they both stood in front of the sink. She confirmed that by "private," she meant Arnold's penis. Asked on cross-examination whether Arnold "actually put [his penis] in the hole where the poop comes out," she indicated that he did.

{¶ 9} C.H. said Arnold's actions "hurt" and made her feel "sad," but she did not say anything to Arnold because she was afraid that "he would say shut up or something" if she told him that it hurt. She thought Arnold also would tell her "to shut up or something" if she called for help. Arnold was "blocking" her against the sink and did not stop what he was doing until C.H. heard a noise from the stairs. Arnold then said "don't tell mom."

{¶ 10} At that point, C.H. felt wet "[i]n my butt," and Arnold grabbed a paper towel, wiped her butt, and threw the paper towel into the kitchen trash can. C.H. pulled up her pants and continued upstairs, but at first was hesitant to tell Mother what happened because she was afraid that she would be in trouble.

{¶ 11} Officer Stephen Cline, an evidence technician with the Dayton police, testified that he collected C.H.'s sexual assault examination kit and the bag containing her pants from Dayton Children's Hospital. He then proceeded to C.H.'s home, where he took photographs and collected evidence that a detective had discovered at the scene. Among that evidence were several paper towels found in the kitchen trash can, including "one that had what appeared to be blood on it." He identified the various evidentiary items he had collected.

{¶ 12} Mary Cicco, a forensic scientist with the Miami Valley Regional Crime Lab, testified as an expert witness in serology and DNA analysis. Cicco identified the evidence collected from C.H.'s body, pants, and home that she had analyzed. Testing only for the presence of semen, she detected no semen on any of the oral, vaginal, anal, or external swabs contained in C.H.'s sexual assault examination kit. Cicco testified that the absence of semen did not mean that penetration had not occurred, however. For example, "an individual may have penetrated and then pulled out and did not leave any ejaculate behind," or "there's been such an extended time frame that you don't have anything that's left."

{¶ 13} A substance that Cicco found on the back of the right leg of C.H.'s pants, however, tested positive for semen. Cicco performed DNA analysis on that semen to obtain a genetic profile, then compared the semen's genetic profile to that of a DNA sample known to have come from Arnold. That comparison confirmed that Arnold was the source of the semen on C.H.'s pants. Additionally, one of the paper towels taken from the trash can in C.H.'s home tested positive for the presence of blood, but no DNA testing was conducted on that specimen. Cicco could not say how long either the semen or the blood found had been present.

{¶ 14} Joshua Spears, a Special Victim Unit detective with the Dayton police, testified that he was dispatched to Dayton Children's Hospital to interview C.H. and Mother late on March 4, 2017. He next contacted his partner, Detective Lindsey Dulaney, to advise her about evidence to look for inside C.H.'s home. After conferring with medical staff at the hospital, Det. Spears left in the morning hours of March 5 to interview Arnold, who had been taken to the police department.

{¶ 15} A video recording of that March 5, 2017 interview with Arnold, edited in response to objections made by both parties, was played for the jury. On the recording, Arnold entered the interview room wearing a medical "boot" and walking with a pronounced limp; he explained that he tore a ligament two months earlier. Dets. Spears and Dulaney both were present throughout the interview. Arnold signed a *Miranda* waiver and consented to a DNA swab of his mouth, which was collected at the beginning of the interview.

{¶ 16} Asked about C.H.'s sexual assault claim, Arnold recounted that he was masturbating in the kitchen of his family home on the morning of March 4 while his sister, C.H., was in the basement checking on the laundry. He stated that, when he heard C.H. coming up the stairs, he ejaculated into a folded paper towel and threw the paper towel into the kitchen trash can. He then went upstairs to his bedroom, but upon later returning to the kitchen, found the used paper towel on the kitchen floor. Picking it up, he noticed a hair on it, so he carried the paper towel back upstairs with him, where he later flushed it down the toilet. Arnold said that he saw dark "particles" coming from the towel after he placed it in the toilet. He speculated that C.H. "did something" with the paper towel. Arnold denied, however, that C.H. had seen him masturbating.

{¶ 17} Arnold told the detectives that C.H. had displayed "attitude" toward him since he had injured his leg and had begun to ask her for help with tasks such as doing laundry and getting food and drinks. He indicated that he had physically disciplined her about three months before by striking her "on the butt" with a backscratcher and by hitting her "in the mouth" a "couple" weeks prior because "she likes to back talk."

{¶ 18} Questioned about the "particles" coming from the paper towel he flushed,

Arnold stated that he saw both brown and black particles of an unknown nature, but also saw what looked like pubic hairs, not his own. He said he suspected that C.H. had rubbed "stuff" from the paper towel onto herself, as C.H. "has a history of doing things." He denied having sex with C.H., touching her, or having his penis exposed in her presence. He also denied that her DNA would be found on his penis, but said he "d[id]n't know" if his DNA would be found on C.H.'s clothing.

{¶ 19} Arnold said he "always" masturbates in the kitchen because his sisters spend most of their time upstairs and he cannot get any privacy in his bedroom. After being told that six other paper towels had been found at the top of the kitchen trash can, in addition to the one he claimed to have flushed, Arnold could not explain how C.H. would know that his ejaculate would be on any paper towel, or on which of the seven it actually would be found. After the detectives pointed out other perceived inconsistencies in his version of events and told him that they did not find his version credible, Arnold changed his story. He indicated that "my DNA is probably on her."

{¶ 20} Arnold said that he had been in the kitchen preparing to masturbate when C.H. came into the kitchen and grabbed his erect penis through his shorts. He said that she then pulled down her pants and lay down on the kitchen floor, face down. Arnold got on top of C.H.'s back and rubbed his penis alongside her "butt" until he ejaculated on her back. He then wiped up his ejaculate with a paper towel. When he later was upstairs and heard Mother ask C.H. what was on the back of her pants, he returned to the kitchen and retrieved the paper towel, which he later flushed down the toilet.

{¶ 21} Asked if the brown "particles" he saw on that towel had been fecal matter, Arnold answered, "probably." Although he previously had said he rubbed his penis on the

side of C.H.'s buttocks, Arnold now said his penis was "kind of between the crack." He denied that he had ever "touched" his seven-year-old sister, however, saying "she's too little."

{¶ 22} The defense presented no witnesses. The jury returned verdicts of guilty on all four counts charged. On July 12, 2017, the trial court merged the unlawful sexual conduct with a minor, gross sexual imposition, and sexual imposition offenses with the Count I offense of rape, and it sentenced Arnold to 10 years of incarceration for that offense. The trial court also advised Arnold that he was being designated a Tier III sex offender.

{¶ 23} Arnold appeals from that judgment, raising two assignments of error:

1) The trial court erred by overruling Appellant's motion for acquittal since the State failed to supply sufficient evidence as to all the elements necessary to support the charges against the Defendant.

2) The jury's verdicts should be reversed as they were against the manifest weight of the evidence.

### Sufficiency of the Evidence

{¶ 24} " '[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary (6 Ed.1990) 1433. "Sufficiency" is essentially "a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955).

{¶ 25} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Marshall*, 191 Ohio App.3d 444, 2010-Ohio-5160, 946 N.E.2d 762, ¶ 52 (2d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 26} An appellate court reviews the denial of a Crim.R. 29 motion to dismiss using the same standard of review that is used to review a sufficiency-of-the-evidence claim. *State v. Cassel*, 2016-Ohio-3479, 66 N.E.3d 318, ¶ 16 (2d Dist.).

{¶ 27} Having reviewed the trial transcript and the video recording of Arnold's police interrogation, we conclude that the evidence presented, when construed in the light most favorable to the State, was sufficient to prove beyond a reasonable doubt the elements necessary to support the verdicts finding Arnold guilty on all four charges against him. The trial court did not err by overruling Arnold's Crim.R. 29 motion for acquittal.

*i.    Rape*

{¶ 28} To convict a defendant of rape in violation of R.C. 2907.02(A)(2), the State must prove that the defendant "engage[d] in sexual conduct with another" and "purposely compel[led] the other person to submit by force or threat of force." Arnold contends that the State presented insufficient evidence of both "sexual conduct" and the use of "force

or threat of force." We disagree.

{¶ 29} The relevant statute defines "sexual conduct" as

vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

{¶ 30} The trial record contains evidence that, if believed, is sufficient to support a finding that Arnold's penis penetrated C.H.'s anal cavity. Daugherty, who has received special training in the care of pediatric victims of suspected sexual assault, testified that she confirmed through age-appropriate questions to C.H. that Arnold's penis actually had entered C.H.'s anus. C.H. also testified that Arnold's actions "hurt." C.H.'s testimony was supported by physical evidence in the form of a paper towel found in the kitchen trash can stained with appeared to be, and what laboratory testing confirmed was, blood,[2] and by Arnold's own testimony that the brown particles on the paper towel he flushed away "probably" were fecal matter.

{¶ 31} In addition, the prosecution's questioning of C.H. included the following exchange:

Q. Now as [Arnold] stood behind you he put his penis into your butt is what

---

[2] Mother testified that the bloody paper towel found in the kitchen trash can by police had not been there when she went to bed on the evening of March 3, 2017, to the best of her recollection. She could not recall anyone in the household bleeding that day.

you told us, okay?

A. Yes.

Q. Now when we say it went into your butt, I need to be a little specific, okay? All right. When you say it went into your butt, when you go to the bathroom, when you go poop in the bathroom, did he put his penis in where the poop comes out of your body?

A. Yes.

{¶ 32} Any ambiguity remaining as to the meaning of C.H.'s direct testimony to that effect was resolved on cross-examination:

Q. Okay. * * * [Y]ou said [Arnold] came up behind you and * * * that he put his private part in your butt?

A. Right.

* * *

Q. Is that right? Okay. And you say put it in your butt, is it – you know what I mean when I say like butt cheeks?

A. Uh-huh.

Q. You know what that means? Okay. Okay, you put it in that part like between your butt cheeks?

A. Yes.

Q. Okay. And [the prosecutor] asked you is where your – where the poop comes out. Do you remember that question?

A. Yes.

Q. Did he actually put it – he didn't actually put it in the hole where the poop comes

out did he?

A. Yes.

Q. He did? Okay. * * *

{¶ 33} Neither was the evidence insufficient on the element of "force or threat of force." R.C. 2901.01(A)(1) defines "force" as any "violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." Regarding proof of force, we have stated:

It has been recognized that proof of physical violence or physical resistance is not required to establish Rape if the defendant creates in the mind of the victim the belief that physical force will be used if the victim does not submit. "The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." "Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established."

State v. Hartman, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 28 (2d Dist.).

{¶ 34} Arnold contends that C.H. denied she was afraid of him, thereby refuting any possible inference that C.H. submitted to Arnold out of fear. Asked by the prosecutor if she was "afraid of [Arnold] for some reason," C.H. responded "[u]h-uh." (See Tr. at 248). The prosecutor continued, "Yeah? No? Okay. * * *" The record thus reflects some ambiguity as to C.H.'s response. However, even assuming that C.H.'s answer was the equivalent of "no," as Arnold argues, that isolated portion of C.H.'s testimony, read in the

context of the evidence as a whole, does not warrant the conclusion Arnold advocates.

{¶ 35} Considering the respective ages of Arnold and C.H, Arnold's acknowledgment during his police interview that C.H.'s disabilities led her to behave even younger than her chronological age, C.H.'s testimony that Arnold pulled down her pants and underwear without her consent, was "blocking" her at the sink, and that she was afraid that he would tell her "to shut up or something," and Arnold's familial position as C.H.'s older brother and an authority figure with an admitted history of using physical force against C.H.,[3] a jury reasonably could conclude that Arnold compelled C.H. to submit by force or the threat of force.

{¶ 36} Given our conclusion that the record contains sufficient evidence to support all necessary elements of the offense of rape beyond a reasonable doubt, Arnold's first assignment of error is overruled as to his rape conviction.

*ii.     Unlawful sexual conduct with a minor*

{¶ 37} A similar conclusion follows as to Arnold's conviction for unlawful sexual conduct with a minor in violation of R.C. 2907.04(A). To prove that offense, the State must establish that the defendant, "who is eighteen years of age or older," engaged "in sexual conduct" with someone who is not his spouse, knowing that "the other person is thirteen years of age or older but less than sixteen years of age," or being "reckless in that regard."

{¶ 38} The undisputed evidence presented at trial established that C.H. was 13 years old and Arnold was 24 years old at the time of the offense charged and that C.H. was Arnold's sister, not his spouse. Given the nature of their relationship and Mother's

---

[3] Arnold in his police interview claimed that Mother had authorized him to discipline C.H. in the past and admitted that he recently had struck C.H. both in the mouth and with a backscratcher to her buttocks when she talked back to him.

testimony that C.H. had lived with their family since the age of six months, the evidence supported an inference that Arnold knew or was reckless regarding C.H.'s age. As we concluded above that the evidence was sufficient to establish the "sexual conduct" element of rape, Arnold's assignment of error based on the alleged insufficiency of the evidence also is overruled as to his conviction for unlawful sexual conduct with a minor.

### iii. Gross sexual imposition

{¶ 39} Finally, we conclude that the State presented sufficient evidence to support Arnold's conviction for gross sexual imposition.[4] Gross sexual imposition requires proof of "sexual contact with another, not the spouse of the offender," and that the offender "purposely compel[led] the other person * * * to submit by force or threat of force." R.C. 2907.05(A)(1). "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 40} Having determined that the evidence presented at Arnold's trial was sufficient to establish beyond a reasonable doubt that Arnold had engaged in "sexual conduct" with C.H., we likewise conclude that such evidence was sufficient to meet the less stringent burden of proving "sexual contact." Additionally, our earlier conclusion that the evidence was sufficient as to "force or threat of force" for purposes of rape dictates that such evidence also was sufficient as to the same element for purposes of gross

---

[4] During closing argument, Arnold's trial counsel conceded to the jury that Arnold was guilty of the Count Four offense of sexual imposition, "because he admitted it." (*See* Tr. at 396). Arnold's brief on appeal likewise does not challenge his conviction as to that offense.

sexual imposition.

{¶ 41} Arnold's challenge to the sufficiency of the evidence therefore is not well taken as to any of his convictions, and his first assignment of error is overruled in its entirety.

***Manifest Weight of the Evidence***

{¶ 42} In contrast to an argument regarding the sufficiency of evidence, an argument based on the weight of the evidence "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Martin*, 2d Dist. Montgomery No. 27220, 2017-Ohio-7431, ¶ 8, quoting *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. When reviewing an argument challenging the weight of the evidence, "'[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Webber*, 2015-Ohio-2183, 35 N.E.3d 961, ¶ 8 (2d Dist.), quoting *Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

{¶ 43} In effect, an appellate court that reverses a conviction based on the weight of the evidence "sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida,* 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Given that the jury saw and heard the witnesses at trial, however, "we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." *Martin* at ¶ 8, citing *State v. Lawson*, 2d

Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." *Webber* at ¶ 8, quoting *Thompkins* at 387.

**{¶ 44}** After reviewing the entire record and weighing the evidence presented at Arnold's trial, we cannot conclude that the jury "clearly lost its way" in finding Arnold guilty as charged. The verdict illustrates that the jury found C.H.'s testimony to be credible, despite the communication challenges presented by her cognitive issues.

**{¶ 45}** While Arnold suggests that C.H.'s account is undermined by the lack of semen found on the swabs taken from her body or the paper towels recovered from the kitchen trash can, the absence of any verifiable semen specimen on those items does not contradict C.H.'s sworn testimony. Cicco, the State's serology and DNA expert, testified to multiple reasons why laboratory testing might not detect the presence of semen following penetration from a sexual assault. Other witness testimony established that, although the incident between Arnold and C.H. occurred on the morning of March 4, 2017, C.H.'s sexual assault examination kit was not completed until the early hours of March 5, 2017. Given the likelihood that C.H. would have used the restroom multiple times during the intervening hours, the jury reasonably could have inferred that any physical evidence on her body was lost during that time span.

**{¶ 46}** Other evidence also weighs against Arnold's "manifest weight" argument. Arnold himself testified that he did not ejaculate inside of C.H.'s buttocks, and that he flushed away the paper towel that he had used to clean up his ejaculate from C.H.'s back. The jury could have determined that such testimony could explain the absence of semen

not only on the swabs collected from C.H.'s perineal area and thighs,[5] but also the absence of semen on the other paper towels recovered from the kitchen trash can. The jury did not need to find that Arnold ejaculated inside of C.H.'s anus in order to find that penetration occurred.

{¶ 47} Arnold's argument on appeal that the State failed to prove "whose blood" was present on one paper towel found in the trash can also was presented to the jury by Arnold's trial attorney during his closing. (*See* Tr. at 403). Any question as to whether the blood on that paper towel was a product of Arnold's interaction with C.H. or even was C.H.'s blood did not cause the jury to lose its way in finding Arnold guilty beyond a reasonable doubt. Its finding to that effect does not constitute a "manifest miscarriage of justice." *See Webber*, 2015-Ohio-2183, 35 N.E.3d 961, at ¶ 8.

{¶ 48} Finally, the jury's implicit finding that Arnold used force or the threat of force to commit his offenses also was not against the manifest weight of the evidence. As noted in our discussion of the sufficiency of the evidence, the jury's conclusion is supported by consideration of the factors we listed above. Arnold's second assignment of error therefore is overruled.

### Conclusion

{¶ 49} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P. J. and HALL, J., concur.

Copies mailed to:

Mathias H. Heck

---

[5] Daugherty did not indicate that any swabbing was done of C.H.'s back for her sexual assault examination kit.

Michael J. Scarpelli
Marshall G. Lachman
Hon. Dennis J. Adkins