[Cite as *State v. Tomlinson*, 2023-Ohio-1688.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Appellee | : | C.A. No. 2022-CA-51 |
| v. | : | Trial Court Case No. 21CRB 01057 |
| CHARLES L. TOMLINSON | : | (Criminal Appeal from Municipal Court) |
| Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on May 19, 2023

. . . . . . . . . . .

DANIELLE E. SOLLARS, Attorney for Appellee

RONALD P. KELLER, Attorney for Appellant

. . . . . . . . . . . .

EPLEY, J.

**{¶ 1}** Defendant-Appellant Charles L. Tomlinson appeals from his conviction in the Xenia Municipal Court after he was found guilty of assault, in violation of R.C. 2903.136(A), and domestic violence, in contravention of R.C. 2919.25(A); the trial court merged the offenses, and Tomlinson was convicted of domestic violence. For the reasons that follow, the judgment of conviction will be affirmed.

## I.        Facts and Procedural History

{¶ 2} Charles and Kimberly Tomlinson began dating in 2003 and were married in the summer of 2015. The pair had a child in 2008 and another in 2015, shortly after their wedding. In 2018, after approximately 15 years of being monogamous, the Tomlinsons decided to "open [their] marriage to be polyamorous," and they both began dating a woman named Courtney. By all accounts, the "triad" was a loving relationship with all three being equal partners, and in October 2020, they decided to make things official with a commitment ceremony. Courtney took the Tomlinson last name.

{¶ 3} At some point thereafter, evidently with the blessings of Charles and Courtney, Kimberly began dating a new woman named Kara, whom she testified was her "approved partner." And while Kimberly was allowed to be romantically involved with Kara, the timing of a date between the two became problematic. Kimberly had scheduled a date with Kara for the triad's anniversary weekend. This was unacceptable for Charles and Courtney because, as Courtney stated, "[w]e are big on celebrating things so we don't just celebrate for a date. We celebrate for days." Trial Tr. at 44.

{¶ 4} On October 14, 2021, Kimberly and Charles got into an argument regarding the date, and while the details of the incident differed as recounted by the three parties, everyone agreed that things became physical between them. Following the incident, Kimberly called 911, but the call purportedly did not go through; law enforcement did not come to the triad's house, and Kimberly did not make a police report that day. In fact, Charles, Kimberly, and Courtney all testified that they sat down to discuss what had just transpired and everyone agreed to seek counseling "so that [they] could stay a family and

move on and heal." Trial Tr. at 47.

**{¶ 5}** Kimberly called-off her date with Kara, and the triad celebrated their anniversary weekend by working at the Renaissance Festival and engaging in sexual activity on both October 18 and 19. On October 20, however, Kimberly went to the Bellbrook Police Department to report the incident that had happened on the 14th. Officers took photographs of Kimberly and then arrested Charles at the triad's home later in the day. Charles testified that he had been completely unaware that Kimberly intended to go to the police and told the court that he was expecting a call that day to get their first counseling appointment scheduled.

**{¶ 6}** Charles was charged with misdemeanor assault and domestic violence, and the case proceeded to a bench trial on January 19, 2022. The court heard testimony from Kimberly, Charles, and Courtney, and it considered several exhibits including text messages between Charles and Kimberly and photographs indicating physical injuries to Kimberly's back and shoulder. A few days later, the court issued a written decision finding Charles guilty of both charges. The assault charge merged into the domestic violence, and Charles was then sentenced to 180 days in jail with 90 days suspended and was given credit for 90 days of pre-trial home arrest.

**{¶ 7}** Charles has filed this appeal, raising a single assignment of error.

## II.    Manifest Weight of the Evidence

**{¶ 8}** In his lone assignment of error, Charles argues that trial court erred by finding him guilty of assault and domestic violence because that conclusion was against the manifest weight of the evidence. We disagree.

{¶ 9} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*

{¶ 10} Unlike the sufficiency of the evidence standard, a reviewing court does not construe the evidence most strongly in favor of the State when using a manifest weight standard of review. *State v. Woullard,* 2004-Ohio-3395, 813 N.E.2d 964, ¶ 81 (2d Dist.). A manifest weight argument examines the believability of the evidence and asks the reviewing court to determine which of the competing inferences is more believable. *Id. See also State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 40 (2d Dist.).

{¶ 11} This case revolves around a physical altercation between Charles and Kimberly – an incident with three sides to the story. Kimberly, the complaining witness, testified that Charles had been upset that she had scheduled a date with her partner, Kara, for the triad's anniversary weekend. Even after the date was cancelled, according to Kimberly, Charles remained angry. She told the court that on October 14, Charles "became very loud and verbally abusive and I pointed out that he was being verbally abusive, and he said, 'say it again and I will show you what abusive is.' * * * And he said

something else that was threatening, and I said that is also verbal abuse; and he launched himself at me, charged me, pushed me into the door that I was standing near, and he pinned and tried to punch me." Trial Tr. at 12. She then stated that when Charles contacted her, her body had been pressed into the door; the doorknob had hit her hip and the windowpanes had hurt her back and shoulders. To buttress this claim, Kimberly presented pictures that showed bruising to her upper back and shoulder area (State's Exhibits 3 and 4) and redness and a welt in what appears to be about the same area (State's Exhibits 2 and 5).

{¶ 12} Charles' account of the incident started out the same as his wife's – the morning of October 14 was spent arguing about their anniversary weekend – but from there on, he described a role-reversal. Charles told the court that it had been Kimberly who spent the morning being emotionally abusive, and when he had compared her actions to that of Courtney's ex-husband and Courtney had agreed with the comparison, Kimberly had tried to attack Courtney. Kimberly "shrieked in a fit of rage. She then stepped forward. As soon as I saw [the clenched] fists and the step forward, I rushed with my arms crossed * * * to catch the fists and intercede between the two of them." Trial Tr. at 62-63. On cross-examination, Charles admitted to making contact with his wife but claimed his intention had been to get in between Courtney and Kimberly. He also recounted that Kimberly had hit the glasses off his face and scratched his neck. Kimberly, for her part, admitted to scratching her husband but insisted that she *took* his glasses off so they would not be damaged.

{¶ 13} Courtney, who was within feet of the action, had an account that also

portrayed Kimberly as the aggressor. She testified that Kimberly "threw up her fists and leaned in" and "wrapped around [Charles'] neck and then went at his face, knocked his glasses off and then grabbed his arm." Trial Tr. at 45. Charles, she said, had been trying to keep Kimberly in one place and never punched her. She stated that she had pulled Charles and Kimberly apart and tried to calm them down. This testimony, however, conflicted with what she initially told law enforcement. Courtney's written statement to police recounted that Charles had "charged" at Kimberly and slammed her into the door. In the initial report, Courtney did not allege that Kimberly had been the aggressor.

{¶ 14} In addition to the testimonial evidence directly relating to the incident, the court also considered evidence about the relationship and what had happened after the altercation.

{¶ 15} First, there was evidence that Kimberly's injuries could have been self-inflicted. The record indicates that Kimberly used a "flogger," a wooden handle that had nine leather flails at the end. Courtney testified she had received a text message from Kimberly letting her know that Kimberly had used the flogger on herself to "stop myself from wanting you and aching for your touch." Trial Tr. at 29, 43. Courtney also told the court that using it had caused Kimberly's back to get very red. Kimberly admitted to using the device when "[her] touch starvation became too great to bear." Trial Tr. at 29. Several of the State's exhibits, which were photographs of Kimberly's injuries, depicted redness and what appeared to be welts – injuries which could have resulted from leather flails hitting the skin. See State's Exhibits 2 and 5. Some of the same pictures, though, showed generalized bruising, which was not necessarily indicative of injuries caused by little

straps of leather.

{¶ 16} The behavior of the parties in the days between the incident (Thursday, October 14) and Charles' arrest on Wednesday, October 20, must also be considered. Everyone testified that after the incident, the group sat down and discussed counseling to make sure the relationship moved forward in a positive manner. It is also clear from everyone's testimony that things seemingly got back to normal. They all worked at the Renaissance Festival as normal, and Courtney testified that the three of them had had a special moment dancing and performing on stage. "[Charles] called [Kimberly] up on stage with me and he danced with her, and she cried because she was so happy. She even said it while we were all in our little huddle on the stage." Trial Tr. at 49.

{¶ 17} Their private life was also seemingly unaffected by the incident between Kimberly and Charles. Courtney testified that Kimberly "didn't shy away from either one of us. And she still wanted all of the constant touching and affection that she's always wanted." Trial Tr. at 48. The triad also celebrated their anniversary. All parties agreed that they had sex together on the 18th and 19th, and Charles recounted that Kimberly had requested it because "that was how she reconnected * * * after any argument." Trial Tr. at 64. Further, both Kimberly and Charles told the court that on the morning of the 20th, the day Kimberly went to the police and Charles was arrested, they had cuddled in bed, and she had fallen asleep in his arms. Trial Tr. at 35, 64.

{¶ 18} Even if things were outwardly stable between the triad, that did not mean that the incident on October 14 had not happened, and it did not mean that the trial court lost its way. "It is well-established that when conflicting evidence is presented at trial, a

conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *In re M.J.C.*, 12th Dist. Butler No. CA2014-05-124, 2015-Ohio-820, ¶ 35. "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61 and 2013-CA-62, 2014-Ohio-3432, ¶ 24.

{¶ 19} After examining all the evidence in the record, we conclude that even though we may not have come to the same outcome as the trial court, this is not the exceptional case in which the evidence weighed heavily against the conviction. The trial court did not err in finding Charles guilty, and the assignment of error is overruled.

### III. Conclusion

{¶ 20} The judgment of the trial court will affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J., concur.